No. 30.—JOHN D. HOWELL, administrator of Jonathan Hudson,
for the use of Seaborn Jones, plaintiff in error *vs.* JOHN
FOUNTAIN, EDWARD CAREY, MICHAEL PERRY, and others, mem-
bers of the Columbus Land Company, defendants in error.

[1.] Courts of justice will not lend their aid to enforce an immoral or illegal contract ;
if it be *executed* they will not disturb it, but leave the parties where they find
them.

[2.] No action can be maintained upon a contract *growing out of* an immoral or illegal
transaction, when the transaction was not subsequent or collateral, but directly
connected with the unlawful act.

In Equity. Bill and demurrer in Muscogee Superior Court.
May Term, 1847. Before Judge ALEXANDER.

For the facts stated in the bill, and the grounds of demurrer, and
errors alleged in decision below, see the opinion delivered by the
Supreme Court.

JONES, BENNING & JONES, for the plaintiff in error, cited the
following authorities :

*Story Eq. Pl. sec.* 326, 328, 455, 541, 543; *Cooper Eq.* 187;
*Mitford,* 180 ; *Story on Part. secs.* 217, 218, 219, 220, 221; *Coll.
on Part.* 143 ; *Story on Part. secs.* 222 *et seq. to* 233; 1 *Bos. &
Pul.* 74; 5 *Eng. Ch.* 27 ; 5 *Maule & Selw.* 336 ; 14 *Com. Law
R.* 67 ; *Treaty with the Creek Indians,* 1832, *in* 5 *Porter,* 413, *in
note, also the case;* 1 *Bos. & Pul.* 3 ; *ib.* 296 ; 2 *Bos. & Pul.* 467 ;
1 *Cowen,* 32 ; 2. *P. Will.* 432; 11 *East.* 180 ; 2 *Story Eq.* 1201,
*and notes ;* 1258, 1259. 1260, 1261, 1262, 1263 ; 8 *Eng. Ch.* 172 ;

1 *Ves. Jr.* 329; 12 *Ves. Jr.* 395; 1 *Howard R.* 56; 2 *Story Eq.* secs. 960, 961, 962.

HOLT, for defendants in error, cited.

5 *Porter R.* 403, 408; 2 *Stewart R.* 175; 11 *Wheat.* 258; 3 *Maule & Sel.* 117, 126; 1 *Bos. & Pul.* 551, (296 *conclusive;)* 3 *East.* 222; 11 *East.* 300; 1 *Taunton,* 227; 4 *John. Ch.* 559; 3 *Condensed Eng. Ch.* 643; 17 *Ves.* 273, 278; 14 *id.* 129; 6 *Cond. Eng. Ch.* 410; 3 *John. Ch.* 193, 194; 2 *McCord. Ch.* 413.

*By the Court.*—NISBET, J., delivering the opinion.

The complainant in this bill alleges, that Hudson and Fountain, who were partners in buying and selling lands, had, in accordance with the requirements of the treaty made by the Federal Government with the Creek Indians, at Washington, in 1832, purchased the reservation upon which an Indian by the name of *Stincharnalika* had been located; that the reservee, *Stincharnalika,* was brought before the certifying agent for the purpose of having the contract certified, and that Hudson and Fountain paid to the Indian, for the land, the sum of two hundred dollars; that, upon examination, it was found that the same land had been bought by the agents of the Columbus Land Company, a partnership entered into also for the purpose of buying and selling lands, and had been certified to that company, and the contract forwarded to Washington for the approval of the President, in accordance with the treaty; that the contract, thus certified, appeared to have been made between the Columbus Land Company and the Indian, *Stincharnalika*; and that the agents of the Columbus Land Company, appearing before the agent of the government, and in the presence of Hudson and Fountain, and of the Indian, *Stincharnalika,* confessed that, by mistake, they had bought the land, not of *Stincharnalika,* the true owner, but of an Indian called *Istencharna,* who represented himself to be *Stincharnalika,* the true owner and reservee; and that thus the contract had been certified in his name to them—they having paid *Istencharna* one hundred dollars for it. The agent being about to write to the government at Washington, to denounce the contract of the Columbus Land Company as fraudulent, and to prevent its approval by the President, it was then and there agreed, (the agent of the government approving and consenting thereto,) that, in order to prevent injury

to the character of the Columbus Land Company, he should not write to Washington and cause the President to withhold his approval to the contract of that company for the land, but should permit it to be approved, and that when it should be approved and sent back, they, the Columbus Land Company, would convey the land to Hudson and Fountain; that Hudson and Fountain should not insist upon the agent's certifying and sending on *their* contract with *Stincharnalika*, but would waive their right to have. it certified and approved; and further, that *Istencharna*, the false Indian, should retain the one hundred dollars paid to him, and that *his* land should be certified to the Columbus Land Company. The bill proceeds to state further, that in pursuance of this agreement, the contract for *Stincharnalika's* land, with the Columbus Land Company, was returned approved by the President, that one-half of the land had been conveyed by the Columbus Land Company to Mr. Fountain, and that the Company had refused to convey the other half to the complainant, who was the administrator of Jonathan Hudson, deceased, one of the partners of the firm of Hudson and Fountain. The bill is brought by the administrator of Jonathan Hudson, deceased, for the use of Seaborn Jones, to enforce; so far as his interest is concerned, the contract thus made between the Columbus Land Company and Hudson and Fountain. I omitted to state in its proper place a fact charged in the bill, which is important to be stated, and that is, that Hudson and Fountain, although buying lands on their own account, were at the same time members of, and of course interested in, the Columbus Land Company. The bill prays that the defendants shall account with the complainant for the money arising from the sale of the land, or rather the one-half of it, which belonged to him, and be decreed to pay over the same with interest. It was demurred to, in the Court below, upon several grounds, and among them this, to wit, " because the contract which the complainant seeks to enforce, was against public policy, illegal, and in violation of the treaty between the government and the Creek Indians, approved at Washington on the 4th day of April, 1832, and therefore void."

The demurrer was sustained, and the complainant excepted. The decision we make, on the ground of demurrer above stated, controls this case; we shall therefore express no opinion upon any other.

[1.]    By the second article of the treaty, the United States engaged " to allow ninety principal chiefs of the Creek tribe, to

select one section of land each, and every other head of a Creek family to select one-half section each, which tracts shall be reserved from sale for their use, for the term of five years, unless sooner disposed of by them."

By the third article it is provided that, " these tracts may be conveyed by the persons selecting the same, to any other person for a fair consideration, in such manner as the President may direct.  The contract shall be *certified by some person appointed for that purpose by the President, but shall not be valid until the President approves the same."*  (*For the treaty see* 5 *Porter Ala. R.* 414.) This treaty is the supreme law of the land, by the Constitution of the Union, and obligatory upon all the departments of the government, State and Federal.   This principle has been settled by the Supreme Court, and will be found applicable to this case : *to wit,* " Where a treaty is the law of the land, and, as such, affects the rights of parties litigating in court, that treaty as much binds those rights, and is as much to be regarded by the Court as an act of Congress."  *United States* vs. *The Schooner Peggy,* 1 *Cranch,* 103 ; 1 *Cond. R.* 256.

The rights of the parties litigating before this Court are affected, as we shall see, by the Creek treaty.  We hold that it must be regarded by us with the  same solemnity, and to the same intents, as if it was an act of Congress.

In reviewing  the transactions detailed in this bill, several preliminary remarks become proper.  And first, it is certainly true, that the contract between *Hudson and Fountain* and *Stincharnalika* was a fair and legal contract.  We do not see that it, in any respect, contravenes the treaty.  It was founded on a valuable consideration, which was paid ; the Indian was brought before the certifying  agent, and declared himself satisfied with it ; and they were entitled to have it certified and sent on to the President for his approval.   Under this treaty, no contract for the sale of the Indian  reservations operated as a valid conveyance, until cer-tified by the  agent, and approved by the President.   By the third article, the reservee is authorized to sell, *in such manner as the President may direct.*   The manner of selling, directed by the President, was for the Indian owner and the purchaser to appear before the agent, and, if the Indian then assented to the contract, the purchase money was paid to him in the presence of the agent. This was intended, no doubt, to protect the ignorant and improvident savage from fraud and imposition.   In this the government

intended to manifest her parental character towards her children. For it had been the boast of the government, in the face of Christendom, that it stood in relation to the aboriginal tribes within her limits, *in loco parentis*. Her charities, it must be conceded, have been those of the step-dame.

*Further*—The treaty itself declares, in the article last referred to, that these contracts *shall be certified* by some person appointed for that purpose by the President; *but shall not be valid unless the President shall approve them.* In *Clartilko* vs. *Elliott* these positions have been settled by the Supreme Court of Alabama. 5 *Porter*, 403.

The second remark preliminary is this—There can be no question at all, but that the contract made by the agents of the Columbus Land Company with *Istencharna*, who represented himself to be, and closed the contract in the name of *Stincharnalika*, was illegal and void, both before and after its approval by the President. Whether the impersonation of the true owner was made with or without the knowledge and approbation of the Columbus Land Company or their agents, or not; whether the contract was entered into by them with *Istencharna* as *Stincharnalika*, by mistake, as the bill avers, or fraudulently and corruptly, is quite immaterial. It was a contract in violation of the treaty, and therefore illegal and void; it was a fraud upon the rights of *Stincharnalika*; it was a contravention of public policy; the policy, to wit, of humanity and justice to the Indians; a policy which our government has avowed from the beginning; *and therefore void.* It was a void contract at common law. If void from the beginning, the certificate of the agent and the approval of the President gave no validity to it. Its approval, under the circumstances detailed in this bill, was a fraud upon the President, and gave to it a deeper and more deadly infusion of invalidity. We are not called upon to adjudge *directly* the validity of the one, or the invalidity of the other of these contracts'; but we are called upon, in order to determine the character of the contract between Hudson and Fountain, and the Columbus Land Company, which it is the object of this bill to enforce, to fix the character of the contract between that Company and the Indian *Istencharna*, acting as *Stincharnalika;* and having fixed it, without reference to a single authority, deeming the question too plain to require such reference, I proceed.

The contract between Hudson and Fountain, and the Columbus Land Company, *grew out of the contract of that Company with*

*Istencharna.* *That* was its basis—without *that*, it would not, could not have been. When Messrs. Hudson and Fountain appear before the agent to consummate their bargain with *Stincharnalika,* for his land, and to demand his certificate, they find that the land has been already sold by *Stincharnalika* to the Columbus Land Company, and certified for them, and the contract remitted to Washington for the President's approval. *Then* come the confessions of that Company. What are they? That they had bought this land from *Istencharna, by mistake,* believing him to be the real owner, and that the contract is illegal and void. Upon the revelation of these facts, the parties confer together, (the agent of the government lending himself to their views, and thus becoming a party to the transaction,) and the result is, that, in order to prevent the developement of this fraud upon the treaty, and a consequent injury to the reputation of the Columbus Land Company, *it is agreed,* that the agent *will not* protest at Washington against the approval of their illegal contract; that the President, trusting to the honesty of his agent, as well as to his vigilance, shall be permitted to approve their illegal contract; and that, when the contract returns approved, they (the Columbus Land Company) will convey the land to Hudson and Fountain; they, on their part, agreeing not to have their own contract for the land certified and approved. Now what is the object of both parties? It is to *suppress the knowledge of an illegal and void, not to say fraudulent, contract, by combining to procure the approval of an illegal and void contract.* What is the consideration of this contract? the prevention of injury and loss of character to the Columbus Land Company. This consideration moved both parties; for, be it remembered, that Hudson and Fountain *were also members of the Columbus Land Company,* and, as such, as well as otherwise, the agreement enured to their benefit. And how is the object of this contract effected? by *procuring the consent of the agent of the government to perpetrate a violation of his official duties.* Really to use the language of Mr. Justice Baldwin, in *Adam Bartlett* vs. *William D. Nutt, administrator of Coleman,* " to state such a case is to decide it." Still, our judgment in this case is based upon authority, as we shall proceed to show; that judgment is, that this contract is illegal and void, and that this Court will not lend its aid therefore to enforce it. No court of law, or chancery, can help this complainant—will lend its aid to enforce a contract made in violation of a treaty, immoral, indecent and wicked—and by the aid of an

officer of the government, acting contrary to his official duties. If this Court should sanction such a contract, it would justly forfeit the confidence of all good men. The rule we lay down is this—So far as such contracts have been *executed*, the Court will not disturb them, but leave the parties as we find them; and so far as they are not executed, will afford no aid whatever to enforce them. The rule is the same, whether the illegality of the contract appears from the plaintiff's case, as here, or is set up by way of defence. Courts will sustain such a defence, not for the sake of the defendant, but upon general principles of public policy. In *Holman* vs. *Johnson*, *Cowp.* 343, Lord Mansfield holds the following language upon this subject: " The objection that a contract is immoral or illegal, as between plaintiff and defendant, sounds, at all times, very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded in general principles of policy, which the defendant has the advantage of, contrary to real justice, as between him and the plaintiff; by accident, if I may so say. The principle of public policy is this, " *ex dolo malo non oritur actio.*" No court will lend its aid to a man upon an illegal or an immoral act. If from the plaintiff's own statement or otherwise, the cause of action appears to arise *ex turpi causa*, or the transgression of a positive law of this country, then the Court says he has no right to be assisted. It is upon that ground the Court goes, not for the sake of the defendant, but because it will not lend its aid to such a plaintiff. So if the plaintiff and defendant should change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, *potior est conditio defendentis.*" So that, although there appears in this case to be an equity in favour of the complainant against the defendant, *that* cannot avail him; we can help *him* in no event upon *his* illegal or immoral contract. We say to this complainant, as Chief Justice Wilmot said in *Collins* vs. *Blantern*, 2 *Wils.* 341, " You shall not stipulate for iniquity, for no polluted hand shall touch the pure fountains of justice."

The distinction relied upon in this case by the counsel for the complainant is this, to wit: admitting the proposition as above stated, that no action can be maintained upon an illegal or immoral contract, yet where the contract was disconnected with the original unlawful act, and was founded on a new and distinct con-

sideration, an action might be maintained upon it, although it could not be maintained upon a contract directly arising out of the illegal act. This distinction is well founded, and we recognise it; The question however arises, is the contract under review disconnected with the original unlawful act? Is it founded on a *new and distinct consideration*? I have shown, I think, that it is not; on the contrary, it is very clear that it is connected necessarily with the original illegal contract of the Columbus Land Company with *Istincharna*—that it springs out of it, and could not have been made without it. And moreover, the consideration moving both the parties, to wit, the suppression of the knowledge of an illegal act and the procurement of the approval of an illegal contract, if it be considered distinct and independent, is in itself illegal and immoral. The authorities in support of the distinction are numerous; the same distinction was taken in *Armstrong* vs. *Toler*, and recognised by Chief Justice Marshall. And if the facts of this cause brought it within that distinction, we would unhesitatingly sustain and enforce this contract. See *Armstrong* vs. *Toler*, 11 *Wheat.* 258; *Faikney* vs. *Reynous*, 4 *Burrow* 2069, *Petrie* vs. *Hannay*, 3 *Term R.* 418; *Farmer* vs. *Russell*, 1 *Bos. & Pul.* 295; *Tennant* vs. *Elliott*, *ib.* 3; *Lloyd* vs. *Johnson*, *ib.* 340; *Watts* vs. *Brooks*, 3 *Vesey Jr.* 612; *Bird* vs. *Appleton*, 8 *Term R.* 562; 4 *Taunt R*, 860; 5 *id.* 181; 5 *ib.* 521; 7 *id.* 246; 1 *Marsh. R.* 561; 3 *Meriv. R.* 469; 4 *Barn. & Ald.* 211; 1 *Jac. & Walk.* 204; 3 *East.* 222; 5 *Barn. & Ald.* 335; 11 *East.* 180; *Gow on Part.* 105; 1 *Fonbl. Eq. b.* 1, *c.* 4, *s.* 4, *note y*; *Puffend.* 1, 3, *c.* 7, *s.* 9, *note* 2.

The ground upon which we put our decision in this case, is [2.] the general principle, *that no action can be maintained upon a contract growing out of an immoral or illegal transaction, where the transaction was not subsequent or collateral, but directly connected with the unlawful act.* Believing that this contract grew out of an act illegal, because in contravention of a treaty, and an immoral act, because involving the compromise of a fraud, and also official infidelity, we rest the case on the principle last stated.

And in support of that principle we refer to the following authorities: *Collins* vs. *Blantern*, 2 *Wils. R.* 347; *Holman* vs. *Johnson*, *Cowp. R.* 341; *Biggs* vs. *Lawrence*, 3 *Term R.* 454; *Clugas* vs. *Panaluna*, 4 *id* 466; *Steers* vs. *Lashley*, 6 *id.* 61; *Booth* vs. *Hodgson*, 6 *id.* 405; *Waymell* vs. *Reed*, 5 *id.* 599; *Ex parte Mather*, 3 *Vesey Jr.* 373; *Ribbans* vs. *Cricket*, 1 *Bos. & Pul.* 264; *Lightfoot* vs. *Tenant*, 1 *id.* 551; *Aubert* vs. *Maze*, 2 *id.* 371; *Shirley* vs. *Shan-*

key, 2 *id.* 130; *Thompson* vs. *Thompson*, 7 *Vesey* 470; *Ex parte Daniels*, 14 *id.* 191; *Ex parte Bell*, 1 *Maul. & Selw.* 751; *Cook* vs. *Jackson*, 6 *Vesey* 11; *Branton* vs. *Taddy*, 1 *Taunt.* 6; *Edgar* vs. *Fowler*, 3 *East.* 222; *Morck* vs. *Abel*, 3 *Bos. & Pul.* 35; *Blackford* vs. *Preston*, 8 *Term R.* 89; *Mitchell* vs. *Cockburn*, 2 *H. Bl. R.* 378; *Cannan* vs. *Bryce*, 3 *Barn. & Ald.* 179; *Duncanson* vs. *McClure*, 4 *Dal.* 308; *Hunt* vs. *Knickerbocker*, 5 *Johns. R.* 327; *Whitaker* vs. *Cone*, 2 *Johns. Cas.* 58; 2 *Johns. Ch.* 147; 14 *Johns. R.* 146; 16 *id.* 438; 15 *Mass. R.* 35; *Wheeler* vs. *Russell*, 17 *id.* 281; 16 *id.* 334; *Frales* vs. *Maybury*, 2 *Gallis. R.* 560; 3 *Cranch R.* 242; 3 *Wheat.* 204; 4 *Dal.* 269; *s. c.* 1 *Binn. R.* 110; 4 *Dal.* 298; 6 *Binn R.* 321; 4 *Yeates* 24; *Nellis* vs. *Clarke*, 20 *Wend.* 24; 15 *id.* 412; 3 *Dana* 540; 3 *Dev.* 519; 4 *Hill N. Y.* 424; 4 *Peters* 184.

This principle may be said to be a rule of universal law, which has been incorporated into the civil code of every nation. *Pothier des Obligations No.* 43, 45; *Des Assurances No.* 58.

I shall conclude this opinion by an extract from the opinion of Mr. Justice Baldwin, delivered in Bartle *vs.* Coleman, 4 *Peters* 184, which seems to me to be strikingly applicable to this case:

" Public morals, public justice, and the well-established principles of all judicial tribunals, alike forbid the interposition of courts of justice to lend their aid to purposes like this. To enforce a contract which began with the corruption of a public officer, and progressed in the practice of known and wilful deception in its execution, can never be consummated or sanctioned by any court. The law leaves the parties to such a contract where it found them. If either has sustained a loss by the bad faith of a *particeps criminis*, it is but a just infliction for premeditated and deeply-practiced fraud; which, when detected, deprives him of anticipated profits, or subjects him to unexpected losses. He must not expect that a judicial tribunal will degrade itself by an exertion of its powers, by shifting the loss from one to the other, or to equalize the benefits or burthens which may have resulted by the violation of every principle of morals and of laws."

Let the judgment of the court below be affirmed.