### 8707. BENSON *v.* GEORGIAN COMPANY.

JENKINS, J. "Where parties are engaged in illegal transactions, whether malum prohibitum or malum in se, the courts of this State will not interpose to grant any relief. In such cases the rule is, for the court to leave the parties where it finds them, no matter whether the illegality of the contract appears from the plaintiff's case, or is set up by way of defense." *Bugg* v. *Towner*, 41 *Ga.* 315; *Howell* v. *Fountain*, 3 *Ga.* 176 (46 Am. D. 415) ; *Puckett* v. *Roquemore*, 55 *Ga.* 235; *Garrison* v. *Burns*, 98 *Ga.* 762 (26 S. E. 471) ; *Martin* v. *Bartow Iron Works*, 35 *Ga.* 320 (Fed. Cas. No. 9157) ; *City of Dawson* v. *Waterworks Co.*, 106 *Ga.* 696 '(32 S. E. 907) ; *Postelle* v. *Rivers*, 112 *Ga.* 850 (38 S. E. 109) ; *Sessions* v. *Payne*, 113 *Ga.* 955 (39 S. E. 325); *Harris* v. *Barfield Music House*, 18 *Ga. App.* 444 (89 S. E. 592) ; *Barfield Music House* v. *Harris*, 20 *Ga. App.* 42 (92 S. E. 402) ; *Jones* v. *Crawford*, 21 *Ga. App.* 29 (93 S. E. 515). The allegations made by the plaintiff's petition bring this suit clearly within the rule above stated; and there was no error in sustaining the demurrer.

*Judgment affirmed. Wade, C. J., and Luke, J., concur.*

DECIDED DECEMBER 14, 1917.

Complaint; from city court of Atlanta—Judge Reid. March 13, 1917.

The action was by W. H. Benson against the Georgian Company. The petition alleges: The defendant publishes newspapers at Atlanta known as The Georgian and Hearst's Sunday American. It

formulated and advertised, for the purpose of increasing the circulation of its newspapers, a plan which contemplated the distribution of $18,000 in prizes to contestants furnishing the greatest number of names as subscribers to these newspapers in certain territory between specified dates; and the details and operation of the plan were confided by the defendant to the direction of a separate department of its business, designated as "The Georgian Home and Automobile Club," which was placed under the management and control of one F. P. Blair. The plan contemplated the allowance of a certain number of votes to be issued to each contestant for every subscription furnished, and the candidate having the largest number of votes in the entire contest was to receive the first prize, a house and lot, the one having the second largest number was to receive a Cadillac automobile, and the one having the third largest number was to receive a Studebaker automobile. The plan as advertised provided that the contest manager had the right to reject any nomination of candidates, and that the defendant had the right to change any plan or make any additions to its conditions that might be decided to be necessary to the interest and welfare of the candidates; and the defendant clothed Blair, as contest manager, with authority to manage the contest, change its conditions, and decide questions arising from its operation, and directed candidates to ask such questions of him. Blair, the contest manager, approached the plaintiff, stated these facts, and urged him to enter the contest, and said that if he would do so and would put up a sum of money to be named by Blair, he would be notified by Blair, before the conclusion of the contest, of the amount necessary to win the first prize. Blair assured him that on account of war conditions the contest had been a failure and only a few contestants had entered, and most of these had retired, and that from his own knowledge of the work being done by the remaining contestants and of their votes, he (the plaintiff) would be certain to win the first prize by the investment of far less than a fourth of its value. To the plaintiff's suggestion that he would not have time to solicit the required number of subscriptions Blair replied that it would not be necessary for him to solicit any subscribers, that the object of the contest was to increase the number of subscribers appearing on the defendant's books, that its newspapers were not interested in whether the sub-

scribers were bona fide or fictitious, that it would be entirely acceptable to the defendant to have the plaintiff pay the amount charged as subscriptions, and furnish the defendant, through Blair, with a list of fictitious subscribers, obtained from any source agreeable to the plaintiff. Being reassured on this score by the statement of the manager of the contest, the plaintiff inquired as to the amount of money he would have to invest to obtain the house and lot, but, because of inability to take from his business the required sum, and for other reasons stated, he declined to enter the contest for the house and lot. Blair thereupon urged him to enter into an arrangement by which the second prize could be secured, and assured him that the Cadillac automobile offered as the second prize, which was of the cash value of $2,115, could be acquired by him upon an investment of not more than $500, and that if under any unforeseen circumstances a larger sum should be necessary to acquire the automobile, the excess would be trivial, and the plaintiff (who resided outside of Atlanta and in Marietta, Ga.) would be informed by Blair what amount would be necessary for that purpose. He entered into the proposed agreement and proceeded in good faith to carry it out, and turned over to the defendant $252.90 in accordance with the agreement, but in a few days thereafter was informed by Blair that it would be necessary to pay the additional sum of $531.70 to acquire the automobile, and that if he should pay that sum it would be sufficient to acquire the automobile, and no further payment would be necessary. He thereupon paid this additional sum to the defendant. Blair then stated to him that he (the plaintiff) had acquired the Cadillac automobile so easily that it would be a shame for him to miss the chance to get at the same time, for little additional outlay, the third prize, a Studebaker automobile valued at $1,525, and that it could be bought for less than $500, that on account of the original conditions of the contest it would be necessary for the plaintiff to work through another contestant, and suggested that he arrange with a certain contestant to use her name and be credited with the amounts paid by her. He entered into the suggested arrangement, paying her $50 for the votes she had obtained, with the agreement that when these votes, together with the sum to be paid to the defendant, should acquire the automobile, it would be his property; and Blair was informed of this transaction

and approved it. Later the defendant sent to the plaintiff an agent who advised him that if he desired the Studebaker car it would be necessary for him to add to these votes cash payments for subscriptions amounting to $451.50, which sum would be sufficient, but that if any slight additional sum should be necessary to acquire the car, he would be notified by Blair; and on this statement he paid to the defendant $451.50. Shortly before the close of the contest he was informed by Blair that a mistake had been made in the figures previously furnished to him, and that it would be necessary for him to pay more money to acquire the automobiles, but that an additional payment of $359.60 by him would result in the acquisition of the Cadillac automobile, and a payment of $436.40 would acquire the Studebaker automobile, that these figures were final and the payment of these sums would insure the delivery of the automobiles to him; whereupon he paid these additional sums to the defendant. On the termination of the contest he discovered that the Cadillac automobile had not been awarded to him, and the Studebaker automobile had not been awarded to him or to the contestant with whom he had made the arrangement stated above, but both automobiles had been awarded to other persons. He thereupon demanded of the defendant the performance of said contracts or the return of the sums invested by him, and was informed by its circulation representative, a Mr. Chandler, that the subscriptions sent in by him were not regular, for the reason that some of them did not appear to be bona fide and others were directed for delivery to agents of the defendant, and the defendant did not desire its agents to be supplied with papers through the contest. The names furnished by the plaintiff to the defendant for subscriptions, accompanied by the stipulated price, and which were taken from directories, were furnished to the said contest manager in alphabetical order, and the said Blair changed the order of the names, and directed, authorized, and accepted the subscriptions as tendered by the plaintiff during the contest. The plaintiff explained that the method of handling these subscriptions had been authorized by Blair, and stated to Chandler that he was entitled to a return of the money paid by him for the subscriptions, as they had been rejected by the defendant as irregular, and he demanded a return of the money so paid, amounting to $2,032.10, but the demand was refused by the defendant,

and the money has never been returned to him. The plaintiff prays judgment for the amounts so paid, with interest.

.The defendant demurred, on the ground that no cause of action was set out in the petition, because: " (*a*) It appears that the defendant [plaintiff?] was endeavoring to secure in a fraudulent manner private information in reference to the standing of other contestants, which information was not to be furnished to said contestants, and to obtain in this manner an unfair advantage over such other contestants. (*b*) The allegations of. the petition are to the effect that petitioner, by wrongful and fraudulent conduct, endeavored to defraud all other contestants and this defendant, and the alleged secret agreement was illegal, fraudulent, and in contravention of public policy, and therefore void." The judge of the city court held that the suit was "based on a fraudulent contract in which both parties participated," and sustained the demurrer and dismissed the petition.

*Hugh Howell, Brewster, Howell & Heyman,* for plaintiff, cited: Goodhart *v.* Mission Publishing Co., 18 Cal. App. 394 (123 Pac. 210) ; 6 Ruling Case Law, 710, 712; *Smith* v. *DuBose, 78 Ga.* 413; *Phenix Ins. Co.* v. *Clay,* 101 *Ga.* 331; *Mut. L. Ins. Co.* v. *Durden, 9 Ga. App.* 797 (3), 800; *Equitable Loan Co.* v. *Waring,* 117 *Ga.* 599 (1), and cases cited in the decision in this case.

*McDuffie & Richardson,* for defendant, cited: *Bugg* v. *Towner,* 41 *Ga.* 315 (1) ; *Puckett* v. *Roquemore, 55 Ga.* 235; *Howell* v. *Fountain, 3 Ga.* 176; *Garrison* v. *Burns, 98 Ga.* 762, 764-5; *Postell* v. *Rivers,* 112 *Ga.* 850; Penal Code (1910), § 719; 9 Cyc. 468; 1 Paige on Contracts, § 402; *Crosby* v. *DeGraffenreid,* 19 *Ga.* 290; *Heineman* v. *Newman, 55 Ga.* 262; *Bagwell* v. *Johnson,* 116 *Ga.* 464; *Sewell* v. *Norris,* 128 *Ga.* 824, 827; *Watkins* v. *Nugen,* 118 *Ga.* 372-3; Jerome *v.* Bigelow, 66 Ill. 452 (16 Am. R. 597) ; Bloss *v.* Bloomer, 23 Barb. 604; Materne *v.* Horwitz, 50 N. Y. Sup. Ct. 41, aff'd in 101 N. Y. 469; 6 Ruling Case Law, 712, sec. 120. Goodhart *v.* Mission Publishing Co., supra, distinguished.