[No. 11489.   Department One.   March 27, 1914.]

CATHERINE D. STIRTAN et al., *Appellants*, v. A. J. BLETHEN, *Respondent*.[1]

CONTRACTS — LEGALITY OF OBJECT — PUBLIC POLICY — ELECTIONS— INFLUENCING RECALL.  A secret contract employing an agent who, without disclosing the principal, was to hire an office, hold public meetings, hire canvassers and circulate petitions to procure a recall election of certain officials, is contrary to public policy and void; the secrecy enjoined being a conclusive badge of corrupt motive.

SAME—EFFECT OF ILLEGALITY—REMEDIES.  Where a secret contract employing an agent to procure a recall election was void as against public policy, the agent cannot recover for moneys expended

[1]Reported in 139 Pac. 618.

as upon an executed independent implied contract of deposit, where, to make a case, plaintiff must rely upon the illegal contract itself; since the law will leave the parties where it finds them.

Appeal from a judgment of the superior court for King county, Tallman, J., entered May 5, 1913, dismissing an action for money paid, upon sustaining a demurrer to the complaint. Affirmed.

*Parker & Brown*, for appellants.

*Bausman & Kelleher*, for respondent.

ELLIS, J.—This action was brought to recover expenses incurred by the plaintiff Catherine D. Stirtan at the instance of the defendant in promoting a recall movement against certain officials of the city of Seattle. A demurrer to the complaint was sustained. The plaintiffs electing not to amend, the action was dismissed. They appeal.

The complaint alleges the adoption, by the city of Seattle, of a charter prescribing the procedure for effecting the removal of elective officers; that, among other things, it provides that a petition, signed by voters equal in number to at least twenty-five per cent of the entire vote at the last preceding election, for all candidates for the office, the incumbent of which is sought to be removed, demanding an election of a successor to such person, shall be filed with the city clerk. It is then alleged:

"That on or about the 20th day of June, 1911, the said defendant, under and by virtue of said charter provision, was desirous of recalling and having successors elected to certain officers in said city of Seattle, to wit: George W. Dilling, mayor of said city of Seattle, Max Wardall, J. Y. C. Kellogg, E. F. Blaine and F. Steiner, councilmen of said city of Seattle, and employed the said plaintiff, Catherine D. Stirtan, by an oral contract, as his agent and representative, to institute and carry out a movement to recall said officers of said city, and then and there, to wit: on or about the day last aforesaid, ordered and directed the said Catherine D. Stirtan to lay out and expend certain money necessary to promote

and carry it to a successful termination, the said recall movement, to wit: to hire an office for the transaction of certain business incident to said movement, to pay the necessary office expenses, to hire·canvassers to circulate petitions for the recall of said officers among the voters of the city of Seattle and solicit signatures of such petitions, to hold public meetings and to do all that might and would be necessary to promote and advance said recall movement, but without disclosing the name of her principal, the said A. J. Blethen, but at all times to exercise great care and caution to keep his name secret and in no event to disclose his connection with the said movement, and then and there  undertook, and solemnly promised the said plaintiff, Catherine D. Stirtan, that he, the said A. J. Blethen, would pay and be responsible for all such expenses and disbursements and that he would promptly and fully and without delay pay the same from time to time as the same accrued, arose or were incurred by the said Catherine D. Stirtan for the purposes aforesaid."

This is followed by allegations that Catherine D. Stirtan, pursuant to this contract, hired an office, held public meetings, hired canvassers and secured sufficient names to petitions to procure a recall election in the case of each of the officers named; that, on June 1, 1912, defendant caused to be filed a number of the names with the city clerk, withholding others, and subsequently withdrew the petitions and abandoned the movement; that defendant paid the expenses as they accrued without objection, down to a short time prior to the discontinuance of the movement; that, a short time before such discontinuance, the defendant ceased paying the expenses and there accumulated salaries of canvassers and other necessary expenses in the amount of $1,500; that this fact was reported to the defendant, who directed Mrs. Stirtan to pay the same, and promised to reimburse her within a short time; that she paid these expenses in the sum of $1,500, by reason whereof the defendant became and is liable to the plaintiffs in that sum.

Two questions are presented by this appeal: (1) Was the contract in question contrary to public policy? (2) As-

suming that it was, can the plaintiffs recover from the defendant money expended in the prosecution of the enterprise?

I. The appellant insists that the contract pleaded violated no sound canon of public policy. It is argued, in substance, that a recall election is not contrary to public policy; that it is a means by which society may protect itself against undesirable public servants; that to hire an office, hold public meetings, circulate petitions among the voters and solicit signatures, is within the express or implied authority conferred by the law relating to recall elections; that these things are incidental to popular government; that it therefore follows that any means by which the public may recall undesirable officers is wholesome and for the public good. Stripped to its essentials, the naked thought which underlies the argument is just this: that because a recall is not contrary to public policy, a contract secretly to finance a movement to create a factitious sentiment in favor of recall, without divulging the true motives or the real personality behind the movement, is to be commended as in furtherance of the public good, rather than condemned as against public policy.

It seems to us that a policy which would justify such a contract, even on a plea of a good motive, would open wide the door to secret contracts of the same character in furtherance of the most sinsiter and corrupt purposes, since the true motive on either side would be difficult to prove, and, if corrupt, would hardly be announced from the house tops. The insidious tendency of the agreement is made manifest by the very fact that public knowledge of its existence would tend largely to defeat its purpose. The very secrecy enjoined by the contract should be held a conclusive badge of corrupt motive. The recall, as an instrument of popular government, is of recent application in this country, and we are cited to no decisions passing upon the validity of such a contract as that here involved. An analogy, however, is found in contracts to influence elections and contracts to influence legislation. The purpose and genesis of the recall make this anal-

ogy plain.   It cannot be questioned that ·the recall and its usual concomitant, the referendum, are wholesome means to the preservation of responsible popular government.   They embody a principle as old as the English constitution.   The frequent appeals of the English ministry from a vote of Parliament to a vote of the people on a given measure, requiring the members of Parliament to stand for reelection upon that measure as an issue, the continuance or resignation of the ministry being dependent upon the result, is obviously but a recall as to the personnel of the government and a referendum as to the given measure.   It is patent, therefore, that every secret compact looking to the advancement of private personal ends by the financing of a recall is just as inimical to a sound public policy as it existed at the common law as would be the same course of conduct when applied to an election itself, or as would be a contract to influence legislation by a secretly paid lobby.   That contracts to influence elections or appointments to public office are void as contrary to public policy is sustained by ample authority.   In *Keating v. Hyde,* 23 Mo. App. 555, a contract intended to influence a primary, though not falling within the express prohibition of any statute, was held void because contrary to public policy.   The court said: ·

"There is a clear distinction between the purchase of services to be devoted to an advertising of the fact that one is, or desires to ·be, a candidate, and the purchase of service to be employed in advocating his peculiar merits and eligibility, so as to influence the choice of the voter."

See, also, *Whitman v. Ewin* (Tenn.), 39 S. W. 742; *Nichols v. Mudgett,* 32 Vt. 546.   There can be no sound distinction between a contract intended to influence the election of an official and a contract intended to influence the recall of an official after he is elected.   The employment of hired canvassers to bring about either result has an inevitable tendency to corrupt the electorate.

Contracts to influence legislation have been almost univer-

sally condemned. In *Sussman v. Porter*, 137 Fed. 161, the plaintiff declared upon a contract whereby his assignor had undertaken to obtain from municipal authorities a franchise for a trolley line and the consent of property owners thereto, and pay the necessary expenses in connection therewith. The court held the contract void as contravening public policy, and denied a recovery. After citing many authorities sustaining its judgment, the court said:

"Cases to the above effect might be cited indefinitely, and very many are cited in the cases already referred to. It is clearly deducible from them that a contract to procure or influence legislation is bad, whatever the intention of the parties may have been, and whether the influences actually exerted thereunder were honest or corrupt. It is the temptation to corruption and dishonesty which the courts will not tolerate. It will be noticed, too, that some of the cases cited lay great stress upon the fact that a contingent fee is dependent upon the success of the service. The rule of law in all these and similar cases is that the court will not aid either party to the contract, but each will be left in the position in which he has placed himself. Judicial aid will not be given to either party to a corrupt agreement. This is not because the court desires to favor either party, but because the agreement is corrupt and tainted."

See, also, *Sweeney v. McLeod*, 15 Ore. 330, 15 Pac. 275; *Marshall v. Baltimore & Ohio R. Co.*, 57 U. S. 314; *Crichfield v. Bermudez Asphalt Pav. Co.*, 174 Ill. 466, 51 N. E. 552, 42 L. R. A. 347; *Richardson v. Scotts Bluff County*, 59 Neb. 400, 81 N. W. 309, 80 Am. St. 682, 48 L. R. A. 294; *Hazelton v. Sheckells*, 202 U. S. 71.

Here, again, there can be no sound distinction between a secret contract to influence legislation and a secret contract to influence the removal of the noncompliant legislators. The tendency of both is to corrupt the public service. The recall was intended to place in the hands of the people an orderly means of combating just such secret and sinister influences, not to cloak a new avenue for their exercise. To hold valid a secret contract to foment a recall through hired

canvassers would be to place in the hands of powerful private interests, with unlimited means, a weapon for secret intimidation and covert attack against executive and legislative officers sufficient to deter upright and self-respecting men from accepting the public trust. The legislature of this state, in 1913, doubtless moved by these considerations, has declared just such practices as those contemplated by the contract here in question gross misdemeanors. Laws of 1913, ch. 146, p. 462, § 16 (3 Rem. & Bal. Code, § 4940-16). This legislation merely declares criminal those practices which the common law has always recognized as contrary to public policy. While the parties to this contract and their hired canvassers are not subject to punishment as for a crime by reason of the lateness of the act, the contract itself is none the less subject to the ban of the common law. We hold this contract contrary to public policy, void, and unenforcible.

II.   The appellants claim that, though the contract was contrary to public policy, the agent should be permitted to recover the money which she advanced in its prosecution. They rely upon the familiar rule that, where the agreement has been fully executed, the agent or partner who has received the proceeds or profits of an illegal business or transaction will not be permitted to defend against an action of the principal or other partner for money had and received, upon the ground of such illegality. In such a case, the right of recovery is referable to an independent implied contract of deposit. *McDonald v. Lund*, 13 Wash. 412, 43 Pac. 348; *DeLeon v. Trevino*, 49 Tex. 88, 30 Am. Rep. 101; *Pfeuffer v. Maltby*, 54 Tex. 454, 38 Am. Rep. 631; *Planters' Bank v. Union Bank*, 83 U. S. 483; *Brooks v. Martin*, 69 U. S. 70;

There is, however, another rule, equally familiar, the complement of that just stated. It is this: Where a plaintiff, to make a case, must rely upon the illegal contract itself, he cannot recover. The law will aid neither party to an illegal

agreement, but will leave the parties where it finds them. *Reed v. Johnson*, 27 Wash. 42, 67 Pac. 381, 57 L. R. A. 404; *Hoffman v. McMullen*, 83 Fed. 372; *Smith v. David B. Crockett Co.*, 85 Conn. 282, 82 Atl. 569, 39 L. R. A. (N. S.) 1148; *Samuels v. Oliver*, 130 Ill. 73, 22 N. E. 499; *Gibbs v. Consolidated Gas Co. of Baltimore*, 130 U. S. 396;

Typical of the authorities cited by the appellants in this connection, is the decision of this court in *McDonald v. Lund, supra*. In that case, both of the rules above stated are recognized, and the principles upon which they rest are clearly announced. There, the plaintiff and defendant had been partners in certain gambling games, each contributing one-half of the money invested. When they had ceased operations, it was understood and agreed between the parties that the plaintiff was entitled to certain moneys, the proceeds of the games, in the defendant's hands, but which he refused to pay to the plaintiff. The court permitted a recovery on the ground that the plaintiff was not compelled to rely upon the illegal contract of partnership, but was entitled to recover upon the admission that the defendant held money belonging to the plaintiff, which raised an implied contract to pay it. The court said:

"Again, this is not a case to enforce any illegal contract, but it is to assert title to money which was accumulated under such illegal contract. If the plaintiff here had brought an action against the defendant for not complying with his contract in running these games, of course it would fall within the rule claimed by the respondent, but here the real contract on which he sues, it seems to us, is a contract of deposit. Under the stipulated facts the illegal transaction which these parties had agreed to pursue had ended. The partnership for that purpose was no longer in existence. The business was no longer being carried on. A determination of the amount of money due from the defendant to the plaintiff had been reached. It was agreed that the defendant owed the plaintiff the sum of money sued for, and that he was entitled to that amount, and the plaintiff's portion was simply left with the defendant on deposit.

. . . This distinction, viz., the difference between suing on, or trying to enforce, the illegal contract itself and a suit to recover money, which is admitted to be due although it may have been obtained by prosecuting an illegal enterprise, has always been respected by the courts from its announcement in the cases we have above cited up to the present time. . . . In the case at bar it is conceded by the statement of facts that the defendant has in hand a thing of value that belongs to plaintiff. It certainly does not belong to defendant, and he has no right, either moral or legal, to keep it. If the question were between the plaintiff and the parties from whom this money was obtained, of course another principle would intervene, but to allow a depositary of a person's money to refuse to turn it over to him because the owner of the money had violated some law in obtaining it would be little short of encouraging robbery."

The distinction between suits in which reliance must be placed upon the original illegal contract and a suit for money had and received on an independent implied contract runs through all of the decisions. In *Reed v. Johnson, supra,* the plaintiff sued to enforce specific performance of a contract held violative of public policy. The court denied relief on the ground that, the contract being contrary to public policy, the court would refuse either party its aid, quoting from the supreme court of Georgia in *Howell v. Fountain,* 3 Ga. 176, 46 Am. Dec. 415, as follows:

"The law leaves the parties to such a contract where it found them. If either has sustained a loss by the bad faith of a *particeps criminis,* it is but a just infliction for premeditated and deeply-practiced fraud; which, when detected, deprives him of anticipated profits, or subjects him to unexpected losses. He must not expect that a judicial tribunal will degrade itself by an exertion of its powers, by shifting the loss from one to the other, or to equalize the benefits or burthens which may have resulted by the violation of every principle of morals and of laws."

In *Hoffman v. McMullen, supra,* the plaintiff and the defendant had entered into a contract to stifle competition in bidding for public work, the agreement being that if either

should get the contract, the profits and losses should be divided equally between them. The defendant secured the contract. The plaintiff sued for a division of the net profits. The court held that he could not recover because he could not make a case without reliance upon the illegal agreement, using the following language:

"The distinction between the cases where a recovery can be had and the cases where a recovery cannot be had of money connected with illegal transactions, to be gleaned from all the authorities, is substantially this: That wherever the party seeking to recover is obliged to make out his case by showing the illegal contract or transaction, or through the medium of the illegal contract or transaction, or when it appears that he was privy to the original illegal contract or transaction, then he is not entitled to recover any advance made by him in connection with that contract or money due him as profits derived from the contract; but when the advances have been made upon a new contract, remotely connected with the original illegal contract, or transaction, and the title or right of the party to recover is not dependent upon that contract, but his case may be proved without reference to it, then he is entitled to recover."

In *Smith v. David B. Crockett Co., supra,* it was held that a contract providing that an employer would reimburse a salesman for money paid as bonuses or bribes to purchasing agents to secure contracts of sale, was illegal and opposed to public policy, and that the salesman could not recover from his employer any sums paid out by him for such purpose. In *Samuels v. Oliver, supra,* the supreme court of Illinois held that an agent who knowingly aids his principal in effecting an unlawful combination cannot recover from his principal advances made for such illegal purposes.

Applying these principles to the case before us, it is plain that the plaintiffs cannot recover. The money which Mrs. Stirtan advanced was for the purpose of hiring canvassers to circulate recall petitions. This purpose, as we have seen, was contrary to public policy. The money she

advanced was for an illegal purpose, under the admitted facts. The contract between Mrs. Stirtan and the respondent has never passed beyond the executory stage. The appellants allege that Mrs. Stirtan has fully performed her part of the contract, namely, the undertaking to organize the recall movement and secure the necessary signatures, but they also allege that the respondent has not performed his part, namely, the undertaking to pay the necessary expenses of the recall movement. The appellants, in their efforts to recover the money which Mrs. Stirtan has paid out in furtherance of the illegal agreement, were compelled to plead, and did plead, as ground of their action, the original agreement between Mrs. Stirtan and the respondent. Without that agreement, there would be no consideration whatever, illegal or otherwise, for a promise on the respondent's part to repay the money so advanced. Without pleading the original agreement, the payment by Mrs. Stirtan to the canvassers would conclusively appear to be a payment of her own debt, a discharge of her own undertaking to her own employees. Manifestly, in order to connect the respondent with the transaction in any manner, she was compelled to plead the original illegal agreement between herself and the respondent. The case is clearly distinguished from *McDonald v. Lund, supra,* upon which the appellants mainly rely. The money sought to be recovered here was not fruits of the illegal venture, nor profits of a closed illegal transaction. It was money expended in furtherance of the illegal contract itself. The situation of Mrs. Stirtan is precisely the same as that of the plaintiff in the case of *Smith v. David B. Crockett Co., supra.* She was the agent of the respondent under the contract pleaded. She claims that she, as such agent, advanced money which the respondent had agreed to pay in his undertaking to finance the recall. As said in that case:

"It is contrary to public policy. It is illegal, and the time spent and the expense incurred by the plaintiff in so

accomplishing or attempting to so accomplish sales were as much a part of the illegal transactions as was the actual payment of the bonus itself.  If such was the real character of this provision, the plaintiff could neither recover for services rendered, nor for expenses incurred, nor for bonuses paid in making the sales."

As said in *Samuels v. Oliver, supra:*

"To say, in such a case, that the agent employed to aid his principal in an illegal enterprise can not recover of his principal for services or money advanced in execution of the illegal purpose, or under his employment, is a correct statement of the law, but the like rule is equally applicable to the principal as to the agent. . . .  When the employment of an agent relates to the performance of an immoral or illegal act,—it is said by Wharton in his work on Agency, (sec. 25,)—neither party can make the contract the basis of a suit against the other.  Advances for illegal purposes fall within the same rule, and can not be recovered by the principal of the agent, or the agent of the principal.  (Id. sec. 319.)"

The contract here involved being contrary to public policy, none of its provisions will be enforced in favor of either party. We must leave the parties where we find them.

The judgment is affirmed.

CROW, C. J., CHADWICK, MAIN, and GOSE, JJ., concur.