Argued January 23; peremptory writ of mandamus granted
February 2, 1942

STATE ᴇx ʀᴇʟ. McPHERSON ᴇᴛ ᴀʟ. *v.* SNELL

(121 P. (2d) 930)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Alfred E. Clark*, of Portland (Clark & Clark and Willis West, all of Portland, and M. B. Hayden, District Attorney, of Salem, on the brief), for plaintiff.

*Rex Kimmell*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for defendant.

BAILEY, J. This is an original proceeding in mandamus, instituted by the State of Oregon on the relation of G. J. McPherson, State Retail Grocers Association and others, against Earl Snell as secretary of state to require him to place on the official ballot for the general election to be held in the state of Oregon on November 3, 1942, a certain referendum measure hereinafter described, or to show cause for not so doing. To the alternative writ as modified by the stipulation of counsel for the respective parties the defendant has filed a demurrer.

The ultimate question here to be decided is whether the statement filed by State Retail Grocers Association, one of the sponsors of the referendum petition, relative to contributions received and expenditures made, was in compliance with § 81-2412, O. C. L. A. The facts hereinafter narrated are admitted by the demurrer.

In 1941 the legislature passed House Bill 558 (Oregon Laws 1941, chapter 488), providing for a tax on cigarettes and commonly known as the "cigarette tax bill". This was filed in the office of the secretary of state April 4, 1941. On June 12, 1941, within ninety days from the date of adjournment of the 1941 legislative assembly, a referendum petition against the bill, signed by more than five per cent of the legal voters of the state of Oregon, was presented to and filed by the secretary of state. The sufficiency of this petition is not here questioned.

At the time of presenting the petition the sponsors thereof, Grocers and Merchants Association, State Retail Grocers Association and G. J. McPherson, tendered to the secretary of state their respective separate statements of contributions and expenditures in connection with the referendum petition. The statements of Grocers and Merchants Association and G. J. McPherson set forth that no contributions had been received or expenditures made by those sponsors of the petition. It is the statement of State Retail Grocers Association with which we are concerned in this proceeding.

The three statements, after being examined by the secretary of state, were filed by him on or as of June 12, 1941. At the time of offering the statements for filing, there were exhibited to the secretary of state by the sponsors of the referendum petition "written vouchers in full and complete detail showing the items making up each sum paid out as shown by the" statement of State Retail Grocers Association. The secretary of state then informed the sponsors "that the said statement, 'Exhibit A' [attached to the alternative writ], was all that was required to be filed at that time; that the said vouchers should not be received or filed by him, and that properly they should not be filed until after the election at which said referendum petition was voted on"; and thereupon "the secretary of state returned the said vouchers to * * * the sponsors of said referendum petition, after which the said referendum petition was filed by the secretary of state."

Paragraph XVI of the alternative writ reads in part as follows:

"That the secretary of state, the tax commission, and all other public officials concerned in the enforce-

ment of said chapter 488, Oregon Laws 1941, held and acquiesced in the view that said referendum was filed in the office of the secretary of state and that said chapter 488 was suspended in its operation, until about December 18, 1941, when the secretary of state advised the tax commission that he did not consider the referendum petition effective against the said law and did not intend to and would not place the same upon the official ballot at the next general election. The proponents of said referendum and the legal voters who signed the same at all times acted in good faith, with the honest purpose to have said measure referred to the people at the next general election, and sought to comply with, and believed they did comply with all constitutional and statutory provisions to carry such purpose into effect. That it was not until December 19, 1941, that they were advised that the view of the secretary of state was that the statement of contributions and expenditures was deemed insufficient and that because thereof the said measure would not be placed upon the ballot at the next general election."

Paragraph XX is in part as follows:

"That the legal voters who signed the said referendum petition had and could exercise no control over the preparation and filing of the statement of contributions and expenditures by those who contributed or spent money for the said referendum petition; that all acted in good faith; that they and the said sponsors were at all times ready, willing and able, and are now ready, willing and able to give complete and detailed information with regard to all contributions and expenditures and to prepare, submit and file in such detail as may be suggested or requested by the secretary of state a statement of all such contributions and expenditures; that the relators believed that the statement of contributions and expenditures filed on June 12th, 1941, was sufficient and in full compliance with the law."

It is further alleged in paragraph XX that since being advised of the opinion of the attorney general of the state of Oregon, hereinafter to be mentioned, the sponsors of the measure have filed with the secretary of state the vouchers that were tendered to him June 12, 1941, and have "also prepared, tendered and delivered to the secretary of state for filing an amended statement of contributions and expenditures designed to meet" the criticism and objections of the attorney general to the statement of receipts and expenditures filed June 12, 1941.

Under date of December 16, 1941, the attorney general rendered to the secretary of state a written opinion in which he advised the latter official that the statement filed by State Retail Grocers Association did not comply with the law in numerous particulars specified, a copy of which opinion is attached to and made a part of the alternative writ. Guided by this opinion, the secretary of state has announced that he will not place the referendum measure upon the ballot for the general election to be held in November, 1942, and has notified the state tax commission and the sponsors of the referendum measure that chapter 488, *supra*, is in full force and effect. The state tax commission has accordingly proceeded to enforce and is now enforcing the provisions of that act.

Preliminarily to discussing the principal question here involved, consideration will be given to the contention of the defendant that this proceeding was not instituted within the time provided by law. Section 81-2105, O. C. L. A., which the defendant cites in this connection, in part thus reads: "If the secretary of state shall refuse to accept and file any petition for the initiative or for the referendum any citizen may apply, within ten days after such refusal, to the circuit court

for a writ of mandamus to compel him to do so." It was on December 19, 1941, that the secretary of state gave notice of his determination not to place the referendum measure upon the ballot, and it was not until January 13, 1942, that application was made to this court for the alternative writ. Therefore, it was more than ten days after the secretary of state gave notice as above mentioned, that this proceeding was instituted.

■ The matter here involved, however, is not the refusal of the secretary of state to accept or file a referendum petition. That petition was filed by him on June 12; 1941. What is concerned is the announced refusal of the secretary of state to place the referendum measure on the ballot for the next general election because of his view, based on the opinion of the attorney general, that the statement of contributions and expenditures does not comply with the requirements of § 81-2412, *supra*. Section 81-2105, *supra*, places no limitation on the time of bringing proceedings such as the one here before us. A reading of this entire section makes it clear that it has reference to the refusal of the secretary of state to file a petition for the initiative or for the referendum. Moreover, this section was enacted in 1907 and has not since been amended. The section of the code with which we are here principally concerned, § 81-2412, *supra*, was originally enacted in 1933 (Oregon Laws 1933, chapter 436) and amended in 1935 (Oregon Laws 1935, chapter 160).

The right of the people of the state of Oregon to vote upon any measure passed by the legislature is reserved to them by § 1 of article IV of the Oregon constitution. This section provides that the legislative authority of the state shall be vested in a legislative assembly, but the people "reserve power at their own option to approve or reject at the polls any act of the

legislative assembly.'' The same section further states that:

"The second power is the referendum, and it may be ordered * * * either by the petition signed by five per cent of the legal voters, or by the legislative assembly, as other bills are enacted. Referendum petitions shall be filed with the secretary of state not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. * * * All elections on measures referred to the people of the state shall be had at the biennial regular general elections, except when the legislative assembly shall order a special election. * * * Petitions and orders for the initiative and for the referendum shall be filed with the secretary of state, and in submitting the same to the people he, and all other officers, shall be guided by the general laws and the act submitting this amendment, until legislation shall be especially provided therefor.''

■■ Section 1 of article IV of the constitution is self-executing, and no enabling act was required to carry it into effect: *Stevens v. Benson*, 50 Or. 269, 91 P. 577; *State v. Langworthy*, 55 Or. 303, 104 P. 424, 106 P. 336. See also: *State v. Harris*, 74 Or. 573, 144 P. 109, Ann. Cas. 1916A, 1156; and *Carriker v. Lake County*, 89 Or. 240, 246, 171 P. 407, 173 P. 573. Nevertheless, the enactment of legislation to aid or facilitate its operation is not only permissible but seems to be contemplated by the wording of the section: *Stevens v. Benson*, supra; *Zimmerman v. Hoss*, 144 Or. 55, 62, 23 P. (2d) 897. See, also, *State ex rel. v. Swanson*, 138 Neb. 597, 294 N. W. 200. Any legislation which tends to ensure a fair, intelligent and impartial accomplishment may be said to aid or facilitate the purpose intended by the constitution. Any safeguard against deception and fraud in the exercise of the

initiative and referendum powers tends to assure to the electorate the benefits conferred by § 1 of article IV.

■ Such legislation, however, must be reasonable, not "curtailing the right or placing any undue burdens upon its exercise": *Stevens v. Benson,* supra. Nor may it "hamper or render ineffective the power reserved by the people": *State ex rel. v. Amsberry,* 104 Neb. 273, 177 N. W. 179; *State ex rel. v. Missouri Workmen's Compensation Commission,* 318 Mo. 1004, 2 S. W. (2d) 796.

The defendant bases his refusal to file the statement here involved on the alleged failure of the sponsors of the petition to comply with § 81-2412, O. C. L. A., which reads as follows:

"That the sponsors of any initiative or referendum petition, at the time of filing their completed petition, shall file with such completed petition a statement showing the contributions and expenditures for said petition, verified by the sponsor or sponsors filing the petition, giving the name and postoffice address of each and every contributor, to the expense of such petition and the amount paid by each; also, the name and postoffice address of every person to whom and for what service any money was paid or promised on account of such petition, or which is owed and to be paid. If such verified statement is not filed, as herein required, the secretary of state shall not place the measure petitioned for on the official ballot."

It is admitted that the statement complied with the first requirement of this statute, in that it properly showed contributions received. It is asserted, however, that the account of disbursements did not show in some instances for what service money was paid.

■ In our opinion, § 81-2412, *supra,* was enacted to facilitate the functioning of the initiative and referendum powers reserved to the people. See *State ex rel.*

*v. Swanson,* supra. Accordingly, this court ought not to give it such construction as to make it a hindrance to and burden upon the exercise of the rights conferred by § 1 of article IV of the constitution: *Stevens v. Benson,* supra. A substantial compliance with the statute in filing the statement of contributions and expenditures is all that is required: *Duff v. Salyers,* 220 Ky. 546, 295 S. W. 871; *Dempsey v. Cassady,* 250 Ky. 810, 64 S. W. (2d) 161; *Land v. Clark,* 132 Cal. 673, 64 P. 1071; 29 C. J. S., Elections, page 314. Moreover, in regard to § 81-2412, *supra,* we should "keep in mind that the language of the constitution, and the statutes enacted for the purpose of carrying out the provisions thereof, should have a liberal construction, 'to the end that this constitutional right of the people may be facilitated, and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this * * * right': *State ex rel. Case v. Superior Court,* 81 Wash. 623, 632 (143 P. 461, 463, Ann. Cas. 1916 B, 838)"; *State ex rel. McHenry v. Mack,* 134 Or. 67, 69, 292 P. 306. See, also, *State ex rel. Carson v. Kozer,* 108 Or. 550, 217 P. 827.

There is not here involved any alleged failure of the sponsors of the referendum petition to comply with the constitutional and statutory requirements in regard to the sufficiency of the petition. That document contained the requisite number of signatures of voters, it was filed with the secretary of state within ninety days from the final adjournment of the legislative assembly and in all respects was in conformity with the mandate of the constitution. It also met all statutory requirements of form and content. There is no question as to the sufficiency of the referendum petition, but only as

to whether the secretary of state shall place the referendum measure upon the ballot, because of alleged insufficiency of the statement accompanying the petition.

Section 81-2412, O. C. L. A., specifies that the sponsors of a referendum petition shall file a statement showing "the name and postoffice address of every person to whom and for what service any money was paid". This language is general. No form of report appears to have been prepared or suggested to sponsors of referendum petitions by the secretary of state, and there is nothing to indicate that there has been any ruling as to the amount of detail to be contained in the statements.

██ In passing upon the sufficiency of such a statement, "the secretary of state acts purely in a ministerial capacity. He performs no judicial function and has no discretion": *Kellaher v. Kozer*, 112 Or. 149, 158, 228 P. 1086. The secretary of state is a ministerial officer and has no right to waive any constitutional or statutory requirement: *State ex rel. Trindle v. Snell*, 155 Or. 300, 309, 60 P. (2d) 964.

The statement of contributions and expenditures filed by State Retail Grocers Association consists of five pages. On the first page are listed the contributions received, and under the heading "Expenditures" is the following: "As per statement attached, $6400". On this page also appears the verification of G. J. McPherson as secretary of that organization.

The opinion of the attorney general thus describes the remainder of the statement:

". . . Attached thereto [to the first page] are two pages setting forth by number the respective checks issued, the dates thereof, the persons to whom issued, with their postoffice addresses, and a brief statement in each instance purporting to show for what such check

was issued; also, attached thereto are two pages bearing the caption 'Statement of persons to whom payments have been made or compensation promised, giving the postoffice addresses and services rendered.' The statements contained on these two pages are in three columns, the first column headed by the word 'Name', the second 'Services', and the third 'Amount'. The totals of the expenditures shown on the first two pages above mentioned and those on the second two pages are each $6,400.''

This explanation by the attorney general might be amplified somewhat by pointing out that the checks listed are numbered from 1 to 69, inclusive, with the exception that No. 9 is omitted from the statement but is shown by the vouchers to have been erroneously issued and therefore canceled. Checks Nos. 59 and 63 are followed by the word "Error" in place of the name of payee, and with the vouchers accompanying the statement is included this explanation in regard to each of the two numbers: "Error No check — No voucher". Checks numbered 1 to 4, inclusive, instead of the amount for which issued, are followed by this note: "Advance See voucher", with number of voucher indicated in each instance. The vouchers which were tendered to the secretary of state when the statement was filed bear numbers corresponding to the checks. All such vouchers have been lodged with the clerk of this court, and the attorney general concedes that they ought to be considered in connection with the statement of disbursements filed by State Retail Grocers Association.

We quote further from the opinion of the attorney general:

"Bearing in mind the requirement of the statute quoted above and the precedents laid down in the foregoing decisions, I notice, first, that the statements of

moneys paid to each of five persons, as set forth in the condensed account under the caption above quoted, give the names and addresses of the persons to whom such moneys were paid and the amounts thereof, but only designate the service as 'field work and expense.' The respective amounts so set forth are the same as the total of the several checks issued to such respective persons as shown by the detailed statement, and the indication of services is substantially the same, although it varies somewhat in some instances. The question here presented is whether the designation of 'field work and expense' is a compliance with the requirement of the statute, which is that the sponsors of any initiative or referendum petition at the time of filing their completed petition shall file a statement showing, among other things, 'the name and postoffice address of every person to whom and for what service any money was paid or promised on account of such petition, or which is owed and to be paid.' ''

The opinion then quotes definitions as found in Webster's New International dictionary (1941) of the meaning of "field work", "field" and "service". The attorney general states that the use of the term "field work" does not "specify or indicate in any way of *what* such service or work consisted", and makes like objection to the use of the word "expense".

The first of the "five persons" to whom the attorney general directs attention in the foregoing quotation is C. R. Walstrom. In the detailed statement it is shown that check No. 1 was made payable to him, as "Advance", and reference is therewith made to voucher No. 35. Checks Nos. 11, 27 and 35 were also made payable to him: No. 11 for "field work"; No. 27 for "field expenses" and No. 35 for "field work and expenses". Voucher No. 11 shows that Mr. Walstrom was paid for "April service" of five days at ten dollars a

day, and that he worked April 24, 25, 28, 29 and 30. Voucher No. 27 contains a detailed statement of expenses incurred by Mr. Walstrom, giving the date, amount and nature of each expenditure. The first of these itemized accounts is dated April 23, 1941, and thus begins: ''Started to work on petitions 9:45 A. M., worked N. of Union Ave., St. Johns and Linnton [Portland].'' It shows the mileage registered on his automobile speedometer when he began work that day and when he stopped. Other items contained in the account are gasoline and parking charges. Reported also therein is that Mr. Walstrom made forty-eight calls and picked up thirty-four petitions on April 23. This same sheet covers his expenses for three days following and includes items of car parking charge and car mileage allowance.

The next itemized statement is dated April 28. It shows that Mr. Walstrom ''left Portland for Hood River, Locks'' and The Dalles. Account is given of the number of miles he traveled, what he paid for his meals, gasoline, hotel accommodations and postage and at what places he stopped. Nine other similar reports were made by Mr. Walstrom, which together with those discussed cover the whole time he worked. They contain numerous notes of his picking up petitions.

Voucher No. 35, corresponding to the check of the same number, payable to Mr. Walstrom, covers his itemized statement of expenses for May 11 and 13 to 17, inclusive. This statement shows where Mr. Walstrom was each day and what he paid out for expenses. He reports for May 11 that he spent Sunday at Baker, and for May 13 that he was at Pendleton, collecting petitions. In this account his expenses total $238.05, and he has credited thereon the sum of $100 advanced to him on April 28 and represented by check No. 1.

The expense account of each of the other four individuals referred to by the attorney general in the foregoing quoted excerpt is shown by the vouchers to contain as much detail as that of Mr. Walstrom. One such account reports not only the number of miles traveled each day, but also the times of arrivals and departures. In every instance the vouchers show the number of days of service rendered and the amount paid per day to the worker, also the car mileage cost. It would only unnecessarily encumber our reports to take up each account and discuss it with particularity. The facts above stated concerning Mr. Walstrom's report of expenditures may fairly be regarded as representative of the other four accounts to which the attorney general specifically objected.

There can be no question that the vouchers show in sufficient detail for what expenses payments were made, and no doubt the attorney general, had the vouchers been before him, would not have raised any objection to the sponsors' showing in this respect. This not only applies to the five reports particularly mentioned, but also to the items of office expense.

For example, one entry of "office expense" for which payment was made by check No. 25 in the sum of $32 comprised numerous different items, each separately receipted: one is for $5 for fees for notarizing certain numbered petitions; another for $5 is for like services; another represents rent of typewriter from April 16 to May 16, $2.50; and other items covered by the same check for $32 are stamps and a stapling machine. This entry and the items comprising it are typical of the detail in which such "office expenses" are explained by the vouchers.

Before considering whether the statement fails to comply substantially with the statute in designating

services rendered as "field work", we direct attention to other objections made by the attorney general, thus noted in his opinion:

"In another instance, the statement of services is: 'Notarial fees and expenses.' No indication is made of what expenses were thus paid or 'what service' was the basis of such expense."

The item complained of is $9.21, paid to F. B. Simpson, of Bend, by check No. 66. The related voucher, No. 66, thus explains the payment:

"Pd for notarizing

| | |
|---|---|
| To swearing 32 sheets at .25 | $8.00 |
| Two phone calls | .60 |
| Postage Prineville to Bend | .36 |
| Express Bend to Portland | .25 |
| "Total | $9.21" |

A further objection of the attorney general is that the sponsors' statement does not, as to checks Nos. 1 to 4, inclusive, indicate the amounts or for what services the checks were issued. Those checks were listed as for advances made to four men employed by the sponsors of the referendum petition. After each of the four checks, in the space for amount and service, was inserted a reference to a specific voucher. An examination of the four vouchers designated shows the amount of each advance, and credit is given for each such sum against the respective expense accounts of the four men.

There remains one other matter to be considered, thus mentioned in the attorney general's opinion:

"An item is shown as having been paid to one person in the sum of $29.50 for 'notarial commission'. Referring to the check register statement it is shown that two checks, Nos. 5 and 6, were issued to that person, the first for $12, and the second for $17.50, and the service

in each case indicated as 'notarial commission'. Every one is presumed to know and take cognizance of the provisions of the statutes of the state. Section 96-101, O. C. L. A., provides the fee to be paid to the secretary of state by one securing a notarial commission as $6.00. Therefore, the overplus between $6.00 and $12.00 and $17.50, respectively, is not accounted for. Again, it is obvious that one person can not use two notarial commissions. Whatever expense such items cover, therefore, is not set forth other than the amount of $6.00.''

Voucher No. 5 shows a payment of $6.00 to and receipt by two different individuals for notarial commission expense; and voucher No. 6 comprises a payment to one individual for $6.00 and to another for $11.50, for notarial commission expense, with receipts attached. The fee of $6.00 paid to the secretary of state for the issuance of a notarial commission is not the only expense ordinarily incurred by a notary public. He is required to give a bond to the state of Oregon and in addition to procure a notarial seal. In one voucher, No. 23, it is shown that the fee to a surety company for a bond was $5.00 and the price of the seal was $6.00. Voucher No. 19 shows similar items; and voucher No. 17 lists $6.00 for the payment to the secretary of state, $4.50 for a bond and $6.50 for a seal.

There is still before us the question whether the words "field work" specify "what service" was rendered in connection with the petition. Webster's New International dictionary (1941 edition) defines "field work" as "work in the field, specifically the task of gathering scientific data from the field", and the word "field" is defined to include "the sphere of practical operation, as of an organization or enterprise, . . . also, the place or territory where direct contacts, as with a clientele, may be made, or first-hand knowledge may be

gained''. The most recent Funk & Wagnalls dictionary (1941 edition) defines ''field'' as ''sphere of action or place of contest, either literally or figuratively; . . . hence, any scene of operations or opportunity for activity''.

In circulating initiative or referendum petitions in a state-wide campaign it is necessary that the petitions be placed in the hands of volunteer workers who obtain signatures, and that they be collected and properly notarized. Those who attend to such details are usually referred to as field workers. The term ''field work'' is not an uncommon expression in connection with political activities. It has no mysterious connotation. We believe that any layman would understand its meaning in the statement.

 The statute does not require that the service for which money is paid be minutely described or that everything an employe does to earn his stipend be set forth in the statement of disbursements. It is our opinion that the statement of contributions and expenditures filed by State Retail Grocers Association is in substantial compliance with the provisions of §81-2412, O. C. L. A. The attorney general has called our attention to no authority to the contrary.

The demurrer to the alternative writ is overruled, and it is ordered that a peremptory writ issue, directing the secretary of state to place on the official ballot for the general election of November 3, 1942, as a referendum measure, House Bill 558, passed by the 1941 legislative assembly.