[No. 42018.   En Banc.   March 29, 1973.]

THE STATE OF WASHINGTON, *Appellant,* v. CONIFER
ENTERPRISES, INC., *et al., Respondents.*

*Slade Gorton, Attorney General,* and *J. Keith Dysart, Chief Deputy,* for appellant.

*William S. Howard,* for respondents.

*Ferguson & Burdell* and *Charles S. Burdell,* amici curiae.

BRACHTENBACH, J.—Respondents challenge the constitutionality of RCW 29.79.490(4). Under that statute they were charged with the crime of giving or offering payment to persons to solicit or procure signatures upon an initiative petition.

Respondents, pursuant to RCW 10.40.110, demurred to the information. The trial court sustained the demurrer and dismissed the charges.

■ At the outset, we deal with respondents' motion for dismissal for want of prosecution. Respondents point out that the King County prosecutor filed the notice of appeal while the briefs and arguments were prepared and presented by the Attorney General. Respondents contend this was an abandonment of the appeal by the prosecutor, that the Attorney General is without authority to prosecute the appeal, and therefore the appeal was abandoned, in effect. On January 20, 1972, this court, the King County prosecutor and respondents' attorney were notified by the Attorney General's office that, with the consent of the King County prosecutor, the Attorney General was being substituted as counsel for the state.

We believe that RCW 43.10.030(4)[1], under these circum-

---

[1] RCW 43.10.030(4) provides that the Attorney General shall:

"Consult with and advise the several prosecuting attorneys in matters relating to the duties of their office, and when the interests of the state require, he shall attend the trial of any person accused of a crime, and assist in the prosecution;"

stances, constitutes sufficient authority for the Attorney General to prosecute this appeal. The motion is denied.

Turning to the merits, the challenged portion of the statute reads:

Every person shall be guilty of a gross misdemeanor who:

. . .

(4) Gives or offers any consideration or gratuity to any person . . . to solicit or procure signatures upon an initiative . . .

RCW 29.79.490.

This provision was part of a comprehensive act relating to the mechanics of exercising the initiative and referendum. Its enactment followed the voters' adoption in 1912 of an amendment to our constitution providing to the people the power of initiative and referendum. In his inaugural speech to the 1913 legislature, Governor Lister called upon that legislature to enact the provisions necessary to make this amendment effective. (1913 Senate Journal, page 80.) A joint senate-house committee introduced the bill, substantially in the form ultimately passed. It received overwhelming approval. (1913 Senate Journal, page 1002; 1913 House Journal, page 943.)

 Our initial inquiry is whether the statute is a valid exercise of the police power. Two steps are involved in measuring the constitutionality of a legislative enactment against the permissible bounds of the police power. First, does it tend to promote the health, peace, morals, education, good order and welfare of the people? More specifically, does it tend to correct some evil or promote some interest of the state? *Shea v. Olson*, 185 Wash. 143, 53 P.2d 615 (1936); *Clark v. Dwyer*, 56 Wn.2d 425, 353 P.2d 941 (1960), *cert. denied*, 364 U.S. 932 (1961). If the answer is yes, the wisdom, necessity and policy of the law are solely within the jurisdiction of the legislature. *State v. Bowen & Co.*, 86 Wash. 23, 149 P. 330 (1915); *Reesman v. State*, 74 Wn.2d 646, 445 P.2d 1004 (1968).

The second inquiry, more narrow, but equally important,

is whether the particular statute under scrutiny bears a reasonable and substantial relation to accomplishing the purpose established in step one. *Markham Advertising Co. v. State,* 73 Wn.2d 405, 439 P.2d 248 (1968); *Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964).

These tests cannot be applied in a vacuum. The state interest to be promoted or the evil to be corrected, and the relationship of the statute to this purpose, must be sought out. However, in a state where legislative intent is seldom recorded, and where only infrequently does a legislative act carry a recital of facts upon which the legislature is acting, the court necessarily has had to engage in certain presumptions.

The basic rule is that if the court can reasonably conceive of a state of facts to exist which justify the legislation, those facts will be presumed to exist. Further, it will be presumed that the statute was passed with reference to those facts. *State v. Laitinen,* 77 Wn.2d 130, 459 P.2d 789 (1969); *Markham Advertising Co. v. State, supra; Shea v. Olson, supra.*

In addition to that presumption, the court is guided by two other rules. First, the burden of establishing the invalidity rests heavily upon the party challenging constitutionality. Second, every presumption will be in favor of constitutionality. *Lenci v. Seattle, supra.*

> These rules are more than mere rules of judicial convenience. They mark the line of demarcation between legislative and judicial functions.

*Lenci v. Seattle, supra* at 668.

With these presumptions and principles at hand, we apply the first test. It is indisputable that there is a substantial state interest in the integrity of the whole scope of the elective processes, including those procedures involved in the direct legislative efforts of the people via the initiative. "It is clear that the integrity of elections, essential to the very preservation of a free society, is a matter 'in which the State may have a compelling regulatory

concern.' " *Canon v. Justice Court,* 61 Cal. 2d 446, 452, 393 P.2d 428, 39 Cal. Rptr. 228 (1964).

If the state has an interest in regulating junkyards (*Lenci v. Seattle, supra*), outdoor signs (*Markham Advertising Co. v. State, supra*) and apple grades (*Clark v. Dwyer, supra*), it unquestionably has an interest in the elective processes. In short, we can readily and reasonably conceive of a state of facts justifying various statutes dealing with and regulating elections, initiatives and referendums. There is a state interest to be promoted and potential evils to be corrected.

The more knotty issue is whether the statute prohibiting the payment of solicitors bears a reasonable and substantial relation to the legitimate end, *i.e.,* the integrity of the initiative and referendum processes.

We conclude that the prohibition in issue does bear such a reasonable and substantial relationship for we can reasonably conceive of a state of facts warranting this particular limitation. It is reasonably conceivable that persons who solicit signatures for pay—not for principle's sake—may adopt measures, employ tactics and assert pressures inconsistent with a free and uncorrupted exercise of the right of initiative. Paid solicitors may or may not go to such lengths to earn their pay. That they may is sufficient.

The tainted results of paid solicitors stand out vividly in *State v. Olcott,* 62 Ore. 277, 125 P. 303 (1912). The proponents of a petition hired a solicitor to be paid 3½ cents per name. He in turn employed a large number of circulators. Some employed ingenuity rather than principle for they simply joined forces, passed the petitions around among themselves, taking turns in forging signatures. The net result was that 3,778 signatures were admitted forgeries out of 13,715 filed. The court itself discovered another 936 names which were either fictitious or absolute forgeries.

In *Stirtan v. Blethen,* 79 Wash. 10, 139 P. 618 (1914), this court refused to allow recovery on a contract employing the plaintiff to solicit signatures on a recall petition, basing its decision on the ground that contracts to influence

elections are void as contrary to public policy. The court said at page 14:

> The employment of hired canvassers to bring about either result [to influence an election or a recall] has an inevitable tendency to corrupt the electorate.

In our judgment RCW 29.79.490(4) is a valid exercise of the state's police power.

We turn then to the conclusion of the trial court that RCW 29.79.490(4) is unconstitutional because it contravenes rights guaranteed by the first amendment to the United States Constitution, as applied to state legislation by the Fourteenth Amendment.

We reject appellant's contention that a legislative enactment challenged as being violative of First Amendment freedoms is entitled to a presumption of constitutionality. Although we will presume a statute challenged as an improper exercise of the state's police power to be valid, any legislative restraint imposed upon a First Amendment freedom "comes into court bearing a heavy presumption *against* its constitutionality." *Fine Arts Guild, Inc. v. Seattle,* 74 Wn.2d 503, 506, 445 P.2d 602 (1968); *accord, Adams v. Hinkle,* 51 Wn.2d 763, 322 P.2d 844 (1958).

Moreover, the state bears a heavy burden of justification where First Amendment rights are threatened; "[m]ere legislative preferences or beliefs" standing alone will not support such legislation. *Schneider v. State,* 308 U.S. 147, 161, 84 L. Ed. 155, 60 S. Ct. 146 (1939). Rather, "only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." *NAACP v. Button,* 371 U.S. 415, 438, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963). And, the requisite connection between the statute and the permissible state interest is necessity; a mere rational, reasonable, or even substantial relationship will not suffice. *Shelton v. Tucker,* 364 U.S. 479, 488, 5 L. Ed. 2d 231, 81 S. Ct. 247 (1960); *NAACP v. Alabama,* 377 U.S. 288, 307-08, 12 L. Ed. 2d 325, 84 S. Ct. 1302 (1964).

The trial court did not specify which First Amendment rights are violated by RCW 29.79.490(4). However, during oral argument before this court counsel for respondents expressly limited his argument to the freedom of speech and the right of assembly. We consider first whether the relevant portion of RCW 29.79.490(4) violates respondents' freedom of speech.

Clearly, the solicitation of signatures for an initiative petition is political expression falling within the ambit of the freedom of speech guaranteed by the First Amendment. But RCW 29.79.490(4) does not make it unlawful for respondents to solicit signatures on an initiative petition. Nor does it forbid others from doing likewise at respondents' request. The statute only makes it unlawful for the respondents to *pay* (or offer to pay) other persons to solicit signatures. This narrow proscription does not abridge respondents' freedom of speech since such payment bears no necessary relationship to their exercise of that right.

As for the right of assembly, respondents have failed to indicate how their right to assemble is in any way impaired by RCW 29.79.490(4), and we find no such impairment. An abstract invocation of a First Amendment right is not sufficient to trigger the more stringent standard of review applicable in those cases where fundamental rights are actually endangered.

We conclude that RCW 29.79.490(4) violates neither respondents' freedom of speech nor their right to assemble.

Respondents finally contend that RCW 29.79.490(4) is prohibited by the last sentence of Const. art. 2, § 1(d) (part of the initiative-referendum clause), which provides that "This section is self-executing, but legislation may be enacted especially to facilitate its operation." Respondents argue that only acts which *facilitate* the exercise of these constitutional rights can be enacted and, therefore, the statute prohibiting payment of solicitors is void because it "delineates, restricts and hampers" the individual rights of the members of the electorate, rather than facilitating their exercise of the power of initiative.

It is correct that legislation adding to the constitutional provisions governing the initiative and referendum can only be enacted "especially to facilitate" the operation of the reserved powers. *State ex rel. Donohue v. Coe,* 49 Wn.2d 410, 302 P.2d. 202 (1956). But, although the legislature is limited to "facilitating" the exercise of the power reserved to the people, this in no way implies that the legislature is unable to prevent corruption of that exercise. Indeed it has been held that any safeguard against deception and fraud in the exercise of the initiative and referendum powers tends to assure the benefits of those powers. *State v. Snell,* 168 Ore. 153, 121 P.2d 930 (1942).

The challenged statute here was enacted to prevent fraud, forgery and corruption, as was its 1913 predecessor. *State ex rel. Case v. Superior Court,* 81 Wash. 623, 143 P. 461 (1914). We hold that RCW 29.79.490 (4), which tends to assure the free and uncorrupt exercise of the initiative and referendum powers, facilitates, rather than restricts or hinders, the operation of the powers reserved to the people by article 2, section 1 of the Constitution of the State of Washington.

The judgment of the trial court is reversed and the case is remanded for further proceedings in accordance with this opinion.

HALE, C.J., FINLEY, HAMILTON, STAFFORD, WRIGHT, and UTTER, JJ., concur.

ROSELLINI, J. (dissenting)—I am unable to subscribe to the theory adopted by the majority, without discussion, that the legislation before this court was enacted pursuant to the police power or to its conclusion that the provision is valid. The authority of the legislature with reference to the initiative and referendum procedures is found in Const. art. 2, § 1(a) (amendment 7), which provides:

Initiative: The first power reserved by the people is the initiative. Ten per centum, but in no case more than fifty thousand, of the legal voters shall be required to propose any measure by such petition, and every such

petition shall include the full text of the measure so proposed.

It further provides that, when filed, such petitions shall take precedence over all other measures in the legislature except appropriation bills and shall be either enacted or rejected without change or amendment by the legislature before the end of the session. Regardless of whether the legislature approves such a measure, it must be submitted to the voters at the next general election for rejection or approval.

Paragraph (d) contains this sentence:

This section is self-executing, but legislation may be enacted especially to facilitate its operation.

Thus the people in reserving a portion of the legislative power to themselves, clearly decreed that the legislature should not interfere with its exercise but should only "facilitate" it.

We are not here concerned with a question whether the legislation in question is reasonably designed to promote the public health, safety or welfare—the sole question before us is whether the provision in RCW 29.79.490(4) (Laws of 1913, ch. 138, p. 418), making it a misdemeanor to give or offer payment to persons to solicit or procure signatures upon an initiative petition, facilitates or hinders the enjoyment of the right of initiatve.

This court has said, in a case involving the right of referendum, which is reserved in the same constitutional provision and to which paragraph (d) is equally applicable:

Those provisions of the constitution which preserve the right of referendum are to be liberally construed to the end that this right may be facilitated, and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right. *State ex rel. Case v. Superior Court,* 81 Wash. 623, 143 Pac. 461 [1914]; *State ex rel. Howell v. Superior Court,* 97 Wash. 569, 166 Pac. 1126 [1917].

*Rousso v. Meyers,* 64 Wn.2d 53, 390 P.2d 557 (1964).

The word "facilitate" means, according to *Webster's Third New Int'l Dictionary* (1964):

1: to make easier or less difficult: free from difficulty or impediment . . . 2: to lessen the labor of (as a person) . . .

The general rule is stated in 82 C.J.S. *Statutes* § 117(b) (1953), as follows:

Under constitutional provisions for initiative and referendum, the legislature generally is authorized to enact reasonable legislation to facilitate the operation of the constitutional provisions. Legislation so enacted must be such as frees the operation of constitutional provisions from destruction or hindrance, and must not curtail the right or place any undue burden on its exercise, or be contrary to the terms of the constitutional provision. If the legislation unreasonably obstructs the initiative or referendum, it is unconstitutional, but any legislation which tends to insure a fair and intelligent referendum aids the purpose of the constitutional provision.

(Footnotes omitted.)

The encyclopedia cites *State ex rel. Ayres v. Amsberry,* 104 Neb. 273, 279, 177 N.W. 179, 178 N.W. 822 (1920); *State ex rel. McPherson v. Snell,* 168 Ore. 153, 121 P.2d 930 (1942); *In re Opinion of Justices,* 294 Mass. 610, 3 N.E.2d 12 (1936); *Warner v. Kenny,* 27 Cal. 2d 627, 165 P.2d 889 (1946); *Whittemore v. Seydel,* 74 Cal. App. 2d 109, 168 P.2d 212 (1946), and *In re Opinion of Justices,* 309 Mass. 631, 35 N.E.2d 676 (1941).

This court has held that the legislature may properly place a limitation upon the time within which, prior to an election, a proposed measure may be filed and the procuring of signatures of voters to the petitions commenced, inasmuch as such a measure looks "to orderly procedure and fairness to the electors" and thus facilitates the exercise of the initiative. *State ex rel. Kiehl v. Howell,* 77 Wash. 651, 654, 138 P. 286 (1914).

Our attention has been drawn to no case involving a statutory provision similar to that which is questioned in this case, and it is apparently conceded that no other state

has enacted such a law. Thus it appears that it is not generally considered that the practice of hiring persons to solicit signatures on petitions leads to unfairness, deception, or fraud in the initiative process. The majority opinion acknowledges that research reveals no clue to the legislative intent in including this provision. My personal suspicion is that this particular clause was the product of excessive zeal of the draftsman.

As this court stated in *Rousso v. Meyers, supra,* the legislature has no authority to enact provisions which hamper the initiative process further than is necessary to fairly guard against fraud or mistake. Was this legislation necessary for that purpose? I think not. I see no substantial relation between the hiring of solicitors and the occurrence of fraud or mistake in the signing of petitions.

In speculating upon the legislative rationale, the appellant hypothesizes that a hired solicitor may bring undue pressure to bear upon a prospective signer. This assumes that a hireling will argue with more vigor and persuasiveness than a true believer—an assumption which is at least debatable. But assuming that it has validity, that goes to prove only that the right to hire solicitors facilitates the initiative process. Persuasion is the very heart and substance of the process. Therefore, whatever facilitates persuasion facilitates the process.

The securing of sufficient signatures to place an initiative measure on the ballot is no small undertaking. Unless the proponents of a measure can find a large number of volunteers, they must hire persons to solicit signatures or abandon the project. I think we can take judicial notice of the fact that the solicitation of signatures on petitions is work. It is time-consuming and it is tiresome—so much so that it seems that few but the young have the strength, the ardor and the stamina to engage in it, unless, of course, there is some remuneration. Of course, if the proponents of a measure happen to own a chain of supermarkets or drugstores, the problem is not so great. They can simply lay the petitions on the counters and tell the clerks to look expectantly

at all customers. However, does this not involve some payment of the "solicitor"?

It seems to me that if paid lobbyists can be tolerated as appropriate to the legislative process, a hired solicitor of initiative signatures is indeed harmless. The majority says that it is conceivable that a hired solicitor will forge signatures. Not only is it conceivable, according to the cited Oregon case, it has already been done. I would certainly think it inconceivable that this would never happen. On the other hand, there is no reason to assume that it will invariably happen or even that it will happen very often. If a person is hired to solicit signatures and instead forges signatures, he has breached his contract as well as violated the law and is not entitled to payment. I know of no common experience which tells us that this type of activity is to be expected any more from hired solicitors than from volunteers.

It is not only conceivable but is a fact that unpaid solicitors sometimes forge signatures. The legislature has provided a heavy penalty for this type of fraud, and I think the penalty is adequate. Attempting to prevent it by encumbering the signature-soliciting process as severely as the legislature has done in this instance is not only an unnecessary and inappropriate measure, it is, in my opinion, forbidden by the constitution.

The Oregon case cited by the majority, *State v. Olcott*, 62 Ore. 277, 125 P. 303 (1912), supports my position rather than that of the majority. The majority opinion does not reveal the facts of the case or the court's holdings. The suit was one brought by the state, on the relation of a district attorney, against the Secretary of State, to enjoin the placing upon the ballot of a referendum upon an appropriation for the state university. Several contentions were advanced. The defendant urged that the court could not inquire into the validity of a petition filed with the Secretary of State, either because it was without authority to go behind the apparent regularity of a petition valid on its face, or because the filing of a petition was a legislative act,

not open to judicial scrutiny. The court rejected both of these theories.

The court also rejected an argument advanced by the relator that the petition was insufficient because the full text of the proposed measure was not attached to each petition, finding that this was not required by the Oregon statute. The final contention, and the one most closely related to the issue in this case, was that the attorney who was hired by the proponents of the measure to secure the necessary signatures knew that many of the signatures were forgeries and that consequently the entire petition should be rejected as a forged document. The Oregon court's discussion of this issue contains some statements which show the court's recognition that the right to hire solicitors of signatures facilitates the initiative process.

The particular referendum petition before the Oregon court was not one which evoked its sympathy or admiration. It appears to have been inspired by vindictiveness of some citizens of one small Oregon town toward another rival town. Nevertheless, the court conscientiously saw its duty as that of preserving and fostering the initiative process and not that of placing obstacles in the path of those desiring to utilize it. The court had this to say about the hiring of paid solicitors:

> That there was no general and spontaneous desire on the part of the general public to withhold the appropriation from the university [the subject matter of the referendum] soon became apparent, and the promoters were compelled to employ an attorney to secure the necessary signatures. *This in itself was not an unusual course, as it is difficult to find citizen[s] who are so devoted to their principles as to be willing to circulate such petitions without compensation.* They employed Mr. Parkinson of Portland, who undertook to procure such signatures for 3½ cents a name. He employed a large number of circulators, who went forth into the highways and byways to procure signatures. Seven of these, at least, devised an easy method of earning their money.

(Italics mine.) 62 Ore. at 284.

There follows a description of the forgery technique used by these dishonest circulators. The court noted that the attorney had removed all the names which he recognized as forgeries. It discounted all names which had been proven to be forgeries and all those which were doubtful, and found that there remained sufficient signatures to validate the petition. It held that where the evidence showed such extensive forgeries as those perpetrated either by or with the connivance of the seven solicitors, the prima facie case made by the affidavits of those solicitors was overcome and the burden was shifted to the proponents to show which signatures were valid.

In its discussion the court noted that it would be almost impossible to circulate a petition in a city the size of Portland without some fictitious names being placed upon it. It also said that, in the absence of evidence of intentional fraud or guilty knowledge on the part of the circulator, it would be an unjust rule to deprive the honest signer of his right to have his signature counted, merely because some disqualified person signed or because some person, without the knowledge of the circulator, affixed a fictitious name or gave a fictitious address. The court did not believe that the attorney hired to procure signatures was aware that forged names were on the petitions when they were presented, but felt that he was negligent in the hiring of some solicitors and allowed his good nature to be imposed upon. Nowhere did the court indicate any disapproval of the practice of hiring solicitors of signatures, any opinion that fraud is a natural or ordinary feature of the practice, or that it is more likely to occur where help is paid than where it is voluntary.

This court need not resort to those police power limitations embodied in the due process and equal protection clauses of the state and federal constitutions to ascertain the invalidity of this legislation. It is clearly outside the legislative authority because it is not designed to facilitate, but rather is designed (thoughtlessly designed, perhaps, but nevertheless designed) to hinder the exercise of the

initiative power. The people have declared in their constitution that the legislature may act with regard to the initiative process, but only for the purpose of oiling the wheels. When the legislature enacted this provision, it set down the oil can and picked up the monkey wrench.

The case of *Stirtan v. Blethen,* 79 Wash. 10, 13, 139 P. 618 (1914), cited by the majority, should be mentioned. The discussion of the case in the majority opinion may create the impression that this court has said that the hiring of an employee to solicit signatures on a recall petition is contrary to public policy. Actually, no statement that broad can be found in the case. The plaintiff there had been employed to hire an office and conduct a campaign to recall certain officers, hiring canvassers as a part of that endeavor, and to do so *secretly.* It was the secrecy of the agreement which the court found offensive, the failure to divulge "the true motives or the real personality behind the movement." This court said:

> The insidious tendency of the agreement is made manifest by the very fact that public knowledge of its existence would tend largely to defeat its purpose. The very secrecy enjoined by the contract should be held a conclusive badge of corrupt motive.

We compared the secretly financed campaign to recall certain officers with a contract to influence legislation by a secretly paid lobby.

There is no suggestion that the respondents in this action engaged in any *secret* campaign.

If secrecy or deception was the evil feared by the legislature when it enacted this provision, it went much further than was necessary to accomplish its purpose. That is to say, it unnecessarily invaded the people's freedom to exercise their right of initiative. A simple requirement—that if the solicitor is paid, that fact shall be disclosed on the face of the petition—would have been all that was needed. However, it has not been suggested that the prevention of deception was in fact the legislative purpose.

When we consider the enormous sums of money which

are spent upon political campaigns—the hiring of advertising agencies and public relations firms, the buying of newspaper advertisements and television time, and the sums which are spent in the hiring of lobbyists to influence legislation directly—it is to me inconceivable that the court should hold that there is a reasonable basis for the conclusion that the hiring of solicitors of initiative petition signatures must entail such evils of fraud or deception as to require that it be banned.

Assuming that there is some potential harm in this practice, however obscure it may be, the fact is that the legislation in question does not facilitate the initiative process but rather places a hobble upon it. It was not necessary to prevent fraud or deception. Other provisions of the act are better designed and more effective to accomplish this purpose. Since the provision unnecessarily hinders the initiative process, it was beyond the authority of the legislature to enact.

I would affirm the trial court.

HUNTER, J., concurs with ROSELLINI, J.