Argued and submitted December 30, 1982, affirmed March 29, 1983

BERNSTEIN BROS., INC.,
*Appellant,*
*v.*
DEPARTMENT OF REVENUE et al,
*Respondents.*

(OTC 1698, SC 28840)

661 P2d 537

John R. Faust, Jr., Portland, argued the cause for appellant. With him on the briefs were Mildred J. Carmack and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Elizabeth S. Stockdale, Assistant Attorney General, argued the cause for respondents. With her on the brief were Dave Frohnmayer, Attorney General, and Theodore W. de Looze, Attorney-in-Charge, Salem.

Before Lent, Chief Justice, and Linde, Peterson, Campbell, Roberts and Carson, Justices, and Jones, Justice Pro Tempore.

LENT, C. J.

Campbell, J., dissented and filed opinion in which Linde and Roberts, JJ., joined.

## LENT, C. J.

Taxpayer Bernstein Bros., Inc. brought this proceeding for a declaratory judgment and an injunction against defendants, Department of Revenue and Clay Myers, State Treasurer of the State of Oregon. Plaintiff asked the tax court to declare Chapter 797 of 1981 Oregon Laws invalid, asserting it is an unconstitutional attempt to inhibit the exercise of the people's power of referendum. Plaintiff also asked the court to enjoin the defendants from collecting the tax imposed by this measure and from enforcing the other provisions. The tax court granted defendants' motion for summary judgment, stating the question presented was moot. We affirm for other reasons.

Taxpayer is a corporation licensed as a cigarette distributor. Under the provisions of Oregon Revised Statutes, Chapter 323, taxpayer is liable for taxes due on the distribution of cigarettes in this state, so the measure in question directly affects it.

The Governor signed House Bill 3090 on August 21, 1981 and the bill was filed in the office of the Secretary of State on August 24, 1981. This bill, which became Chapter 797, created a temporary additional cigarette tax until July 1, 1983. (See Appendix.) Section 9 of this act states this temporary additional tax will change into a permanent additional tax if "this Act" is referred to the people and they approve it. Taxpayer argues that this section by itself is an impermissible interference with the referendum process guaranteed by the Oregon Constitution, and the entire measure must be declared unconstitutional because of the effect of Section 9. It contends that the present temporary additional tax is a result of this unconstitutional section.

Article IV, section 1, of the Oregon Constitution provides that the people reserve a referendum power over all acts of the legislature except those declared to be emergencies.[1] Article IX, section 1a, provides that the legislature cannot declare an emergency concerning a taxation

---

[1] Constitution of Oregon, Article IV:

"Section 1. (1) The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.

act and in that way prevent a referendum.[2] As we said in *Multnomah County v. Mittleman,* 275 Or 545, 551, 552 P2d 242 (1976), the effect of this section is the same as if the Oregon Constitution included a provision expressly stating that the legislative assembly may not limit in any way the referendum powers reserved by the people.

Both parties moved for summary judgment in the tax court. The court granted defendants' motion stating that the question was moot because no one attempted a referendum within the constitutional time limit. Taxpayer appealed to this court. We have jurisdiction under ORS 305.445.

Defendants argue that taxpayer cannot prevail because the question presented is moot and, alternatively, section 9 can be severed and does not affect the temporary tax levied by the legislature. Neither party referred us to a case involving a similar statute, and we were unable to find one.

## MOOTNESS

■ Defendants contend, and the tax court held, that taxpayers cannot obtain relief because this action presents

---

"* * * * *

"(3) (a) The people reserve to themselves the referendum power, which is to approve or reject at an election any Act, or part thereof, of the Legislative Assembly that does not become effective earlier than 90 days after the end of the session at which the Act is passed.

"(b) A referendum on an Act or part thereof may be ordered by a petition signed by a number of qualified voters equal to four percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition. A referendum petition shall be filed not more than 90 days after the end of the session at which the Act is passed."

[2] Constitution of Oregon, Article IX:

"Section 1a. * * * The Legislative Assembly shall not declare an emergency in any act regulating taxation or exemption." (Created through initiative petition filed June 23, 1910, adopted by people Nov. 8, 1910; Amendment proposed by S.J.R. No. 10, 1911, and adopted by people Nov. 5, 1912.)

It is interesting to note that in 1910 the people of Oregon adopted an initiative measure that amended the Oregon Constitution by the addition of Article IX, section 1a, providing that: "No bill, regulating taxation * * * shall become law until approved by the people of the State at a regular general election * * *." In 1912 that amendment was repealed and replaced by the present provisions of Article IX, section 1a.

no justiciable controversy and is moot. Borchard, *Declaratory Judgments* 35 (2d ed 1941) states that "moot" is used for an action when it is or has become fictitious, hypothetical, academic or dead. We believe defendants are using the word as a synonym for "dead." They argue that section 9 did not become operative and can never become operative because the act was not referred within the constitutional time limit.

Defendants, however, mischaracterize taxpayer's objection to this measure. Taxpayer is challenging the temporary tax increase itself, along with all the other provisions. It alleges that the present tax is a result of the unconstitutional threat of a permanent tax that would have resulted if an unsuccessful referendum had been held. The temporary tax increase is presently in effect, and will be until July 1, 1983. Even if our decision had not been reached before the termination of this additional temporary tax, the controversy would have continued to be justiciable, insofar as taxpayers could argue for a refund of taxes collected under the authority of an unconstitutional tax. Taxpayer is not challenging the permanent tax increase that would have resulted from an unsuccessful referendum. There is no such permanent tax increase.

## CONSTITUTIONALITY

■ Defendants urge us to consider the issue of severability before we consider the constitutionality of section 9. However, if section 9 is in fact constitutional, there would be no reason to address severability. When a party contends the entire act is unconstitutional, as here, severability is not germane until the constitutional claim itself is resolved. *See Standard Lbr. Co. v. Pierce et al.*, 112 Or 314, 228 P 812 (1924).

■ The power to invoke a referendum is a constitutional power reserved by the people. The creation of the referendum power (along with the initiative power) changes the allocation of legislative power within a state, because after this creation the legislative power is shared between the people and their representatives. *State ex rel Pierce v. Slusher*, 119 Or 141, 146-147, 248 P 358 (1926). Oregon was one of the first states to create these powers, and this court has consistently defended them against any encroachment.

As early as 1907 we said that the state may not curtail the power of referendum or place an undue burden on the exercise of the power. *Stevens v. Benson,* 50 Or 269, 274, 91 P 577 (1907). The only power the legislature has is to pass legislation that aids or facilitates the purpose intended by the constitution. *State ex rel v. Snell,* 168 Or 153, 160, 121 P2d 930 (1942).

■     Section 9, in providing for a permanent cigarette tax increase if the voters approved the temporary tax, did not directly preclude a popular vote on the measure or any part that might be referred. It was, however, likely to give opponents of the tax second thoughts before undertaking a petition campaign to refer the entire measure to a vote. The question therefore arose during oral argument whether this referendum power was created for the majority of the people of the state or for the opponents of legislative enactments. We conclude that the power itself was created to benefit the majority of the people by suspending operation of a statute until the people have an opportunity to approve or reject legislation. *See,* Barnett, *Initiative, Referendum and Recall in Oregon,* 5 (1915). However, this power can be effective only if someone goes to the effort and expense of invoking a referendum. Generally only an opponent would do this. In order to protect the rights of the majority of the people, it is necessary to protect the rights of opponents of legislation to bring the issue before the voters without fear of incurring even worse consequences.

■     Taxpayer contends that the only reason section 9 was inserted into this act was to discourage the opponents from forcing a referendum. Defendants insist the motivation for section 9 was not a sinister desire to discourage a referendum. Instead, they suggest, this section provides an entirely innocent method to find out whether the voters of the state would support a permanent cigarette tax increase. They explain that rather than go to the expense of referring a permanent cigarette tax increase to the voters, the legislature decided that if a referendum were held on the temporary cigarette tax increase, the legislature could use this vote as an opportunity to poll the voters on their attitude to a permanent increase. They cite no legislative history that we find supports this theory. Even if we were to accept this explanation of the Legislative Assembly's motivation,

it could have no effect on our decision. When a statute or portion thereof inhibits the exercise of the power of referendum guaranteed by the constitution, even an honorable motive cannot rescue it.

■ Both from the face of the act and the legislative history[3] which has been brought to our attention, we find it clear that the legislature did not want this tax act referred to the people. The invocation of referendum, by itself, regardless of the outcome, would have diminished the amount of money raised by the act. Because the measure was not referred, it went into effect December 1, 1981. If a petition invoking a referendum had been filed, the temporary tax increase could not have gone into effect until after the election in May of 1982. This election date was authorized by Oregon Laws 1981, chapter 802. Even if the people approved the temporary tax increase in May, the state could not raise any revenue until June 1, 1982. The state would have lost six months of income from a referendum.

Endeavoring to ensure that no one would force a referendum, the legislature attempted to raise the ante. Generally when opponents of a tax measure invoke a referendum, the stakes are not raised. If the voters reject the act, the tax will not go into effect, and if the voters approve the act, the tax will go into effect. It is that simple. Here the situation was different. If opponents had invoked a referendum on "this Act" and the voters approved the act, the opponents would not only be liable for the original tax increase, but also for an additional tax. That would be the price for an unsuccessful referendum of "this Act," and in the present case perhaps no one was willing to take the chance of being forced to pay that price.

We approved an alternative taxing measure in *Marr v. Fisher,* 182 Or 383, 187 P2d 966 (1947). In that case, relied on heavily by defendants, the legislature itself referred one revenue measure to the public. In the same session, it enacted other revenue measures with alternative provisions; one alternative was to be effective if the people passed the referred measure, and the other to be effective if

_____
[3] *See* Minutes of the Joint Conference Committee, Governor's Tax Proposal, August 1-2, 1981, Tape 13, Side A.

the people rejected the referred measure. In that situation all the measures could have been referred. Nothing in the legislation attached a penalty to a referendum. Here, however, section 9 imposed a penalty for an unsuccessful vote on a referendum of "this Act" and, because of this penalty, opponents of a tax measure might well have been inhibited in invoking a referendum of the entire measure.

A most unusual situation is here presented. The *intent* of the legislature in sections 1 through 8 of the measure was to impose a tax; the *purpose* of section 9 was to chill the exercise of the power of referendum, by which legislative intent might have been thwarted. That purpose is not to be tolerated. Had the legislature accomplished that purpose, we would have no hesitancy in striking down the statute. Fortunately, insofar as the constitutionality of chapter 797 is concerned, the legislature did not employ text sufficient unto its purpose.

■ ■ It is axiomatic that we should construe and interpret statutes "in such a manner as to avoid any serious constitutional problems." *Easton v. Hurita,* 290 Or 689, 694, 625 P2d 1290, 1292 (1981). Here we deal with construction of a part of section 9 of the legislative act. As noted in the appendix, section 9 states in pertinent part:

> "If *this Act* is referred to the people under section 1, Article IV, Oregon Constitution, and is approved by a majority of the voters voting on *the measure,* then * * * [the permanent tax is imposed]." (Emphasis added)

Footnote 1, *supra,* contains the text of Oregon Constitution, Article IV, section 1, and that text reserves the power of referendum as to "any Act, or part thereof." Section 9 of the Act refers only to exercise of the power of referendum of "this Act."

Under the constitutional text the power of referendum could have been invoked as to the "Act," i.e., sections 1 through 9 of Oregon Laws 1981, chapter 797, or could have been invoked as to "part thereof," for instance, sections 1 through 8. If the words "this Act" in section 9 are construed to mean "this Act, or any part thereof," the statute must be declared invalid as offending the constitution for the reasons above discussed. If the words are taken at face value, however, all of the act except section 9 could

be referred and, if approved by the voters, section 9 would not work to make the tax permanent because "this Act" was not referred. Taking the words used by the legislature at their face value does not serve to chill· the power of referendum, and the statute does not offend the constitution.

Had the legislature desired to make section 9 contingent upon referral of part of chapter 797 ("the Act") as well as the entire act, it knew how to do so specifically. The words "Act, or any part thereof" appear not only in Article IV, section 1, of the Oregon Constitution, but also in ORS 182.080(1), dealing with the effects of repeal of statutes or parts of statutes that authorize the state to collect, receive or spend money.

Applying the rule of construing a statute so as to save its constitutionality, therefore, we find that chapter 797 should be construed as meaning that the words "this Act" are not to be read as "this Act, or any part thereof." Under that construction there is no constitutional infirmity as here contended.

The dissent speculates as to what course an opponent might follow, or refrain from following, because of section 9. Were speculation in order, one might well infer that an opponent of the temporary tax would believe that there would be little chance of defeating the temporary tax at the polls, given current popular attitudes with respect to cigarette smoking, and, consequently, there would be a better chance of defeating that tax by having "this Act" declared to be unconstitutional by the courts of this state. Our decision does not rest upon the validity of speculation as to either course.

The decision of the tax court refusing to declare the statute unconstitutional and refusing to enjoin the defendants as prayed for by plaintiff is affirmed, but for the reasons above stated.

Affirmed. Defendants are awarded costs and disbursments.

## APPENDIX

Oregon Laws 1981, chapter 797:

"SECTION 1. Sections 2 to 6 of this Act are added to and made a part of ORS chapter 323.

"SECTION 2. (1) In addition to and not in lieu of the tax upon distributions of cigarettes imposed by ORS 323.030, every distributor shall pay a tax upon distributions of cigarettes that occur on or after the first day of the month following the effective date of this 1981 Act, and prior to July 1, 1983, at the rate of three and one-half mills for the distribution of each cigarette in this state.

"(2)   All moneys received by the department from the tax imposed by subsection (1) of this section shall be paid over to the State Treasurer to be held in a suspense account established under ORS 292.445. After the payment of refunds, the moneys shall be credited to the General Fund.

"SECTION 3. (1) For the privilege of holding or storing cigarettes for sale, use or consumption, a floor tax is hereby imposed upon every dealer at the rate of three and one-half mills for each cigarette in the dealer's possession or control at 12:01 a.m. on the first day of the month following the effective date of this 1981 Act.

"(2)   The tax imposed by this section is due and payable on or before 20 days from the first day of the month following the effective date of this 1981 Act. Any amount of tax imposed by this section which is not paid within the time required shall bear interest at the rate of one percent per month, or fraction thereof, from a date which is 20 days after the first day of the month following the effective date of this 1981 Act, until paid.

"(3)   Every dealer, on or before 20 days from the first day of the month following the effective date of this 1981 Act, shall file a report with the department in such form as the department may prescribe. Dealer reports shall state the number of cigarettes in the possession of or under the control of the dealer in this state at 12:01 a.m., on the first day of the month following the effective date of this 1981 Act, and the amount of tax due thereon. Each report shall be accompanied by a remittance payable to the department for the amount of tax due.

"SECTION 4. For the privilege of distributing cigarettes as a licensed distributor and for holding or storing cigarettes for sale, use or consumption a floor tax and cigarette indicia adjustment tax is hereby imposed upon every licensed distributor as follows:

"(1)   In the amount of seven cents for each Oregon cigarette tax stamp or meter impression bearing the designation "20" and in the amount of three and one-half cents

for each Oregon cigarette tax stamp bearing the designation "10", which is affixed to any package of cigarettes in the possession or control of a licensed distributor at 12:01 a.m. on the first day of the month following the effective date of this 1981 Act.

"(2) In the amount of seven cents for each unaffixed Oregon cigarette tax stamp bearing the designation "20" and three and one-half cents for each unaffixed Oregon cigarette tax stamp bearing the designation "10" and 70 cents for each unused meter register unit, in the possession or control of the licensed distributor at 12:01 a.m. on the first day of the month following the effective date of this 1981 Act.

"SECTION 5. (1) Every licensed distributor shall take an inventory, as of 12:01 a.m. on the first day of the month following the effective date of this 1981 Act, of all packages of cigarettes to which are affixed Oregon cigarette tax stamps or meter impressions and all unaffixed Oregon cigarette tax stamps and unused meter register units in the distributor's possession or control. Every licensed distributor shall file a report with the Department of Revenue on or before 20 days after the first day of the month following the effective date of this 1981 Act in such form as the department may prescribe, showing:

"(a) The number of Oregon cigarette tax stamps and meter impressions, with the designations thereof, which were affixed to packages of cigarettes in the distributor's possession or control at 12:01 a.m. on the first day of the month following the effective date of this 1981 Act.

"(b) The number of unaffixed Oregon cigarette tax stamps, with the designations thereof, and unused meter register units which were in the distributor's possession or control at 12:01 a.m. on the first day of the month following the effective date of this 1981 Act.

"(2) The amount of tax required to be paid with respect to the stamp, meter impressions and meter register units shall be computed and remitted with the distributor's report. Any amount of tax not paid within the time specified for the filing of the report shall bear interest at the rate of one percent per month, or fraction thereof, from the due date of the report, until paid.

"SECTION 6. The provisions of sections 3 to 5 of this 1981 Act shall not apply to cigarettes owned and in the possession or control of a licensed distributor or to cigarettes stored in a bonded warehouse and which are nontax

paid under the provisions of chapter 51 of the Internal Revenue Act of 1954, as amended.

"SECTION 7. ORS 323.455 is amended to read:

"323.455 (1) All monies received by the department [under this chapter] *from the tax imposed by ORS 323.030(1)* shall be paid over to the State Treasurer to be held in a suspense account established under ORS 293.445. After the payment of refunds, seven-ninths shall be credited to the General Fund. One ninth is appropriated to the cities of this state and one-ninth is appropriated to the counties of this state.

"(2)  The moneys so appropriated to cities and counties shall be paid on a monthly basis within 35 days after the end of the month for which a distribution is made. Each city shall receive such share of the money appropriated to all cities as its population, as determined under ORS 190.510 to 190.590 last preceding such apportionment, bears to the total population of the cities of the state, and each county shall receive such share of the money as its population, determined under ORS 190.510 to 190.590 last preceding such apportionment, bears to the total population of the state.

"SECTION 8. ORS 323.075 is amended to read:

"323.075. Every distributor engaged in business in this state and selling or accepting orders for cigarettes with respect to the sale of which the [tax imposed by subsection (1) of ORS 323.030 is] *taxes imposed by this chapter are* inapplicable shall, at the time of the making the sale or accepting the order or, if the purchaser is not then obligated to pay the [tax] *taxes* with respect to [his] *the* distribution of the cigarettes, at the time the purchaser becomes so obligated, collect the tax from the purchaser, if the purchaser is other than a licensed distributor, and shall give to the purchaser a receipt therefor in the manner and form prescribed by the department.

"SECTION 9. If this Act is referred to the people under section 1, Article IV, Oregon Constitution, and is approved by a majority of the voters voting on the measure, then section 2 of this Act is amended to read:

"Sec. 2.(1) In addition to and not in lieu of the tax upon distributions of cigarettes imposed by ORS 323.030, every distributor shall pay a tax upon distributions of cigarettes that occur on or after the first day of the month following the effective date of this 1981 Act [, and prior to July 1,

1983,] at the rate of three and one-half mills for the distribution of each cigarette in this state.

"(2) All moneys received by the department from the tax imposed by subsection (1) of this section shall be paid over to the State Treasurer to be held in a suspense account established under ORS 293.445. After the payment of refunds, the moneys shall be credited to the General Fund."

Brackets indicate deleted material. Additions are indicated by italics.

## CAMPBELL, J., dissenting.

The majority states that the purpose of section 9 was to chill the exercise of the power of referendum and that had the legislature accomplished that purpose, it would have no hesitancy in striking down the statute. 294 Or 621. I believe that the legislature did accomplish its purpose, and the statute must be struck down. The plain fact of the matter is that no one tried to invoke a referendum. It is possible that the presence of section 9 is the reason.

As the majority noted at 294 Or 616, the right to invoke a referendum is guaranteed by our Oregon Constitution, and the legislature may do nothing to limit this right. By enacting section 9, the legislature clearly intended to discourage the exercise of this right. This section created an inhibition on the exercise of the right that cannot be tolerated. There can be no penalty attached to the exercise of this right. The possibility that the temporary tax would change into a permanent tax is a threat of a penalty that would discourage an opponent from attempting to invoke a referendum. This is clearly unconstitutional.

The majority makes a distinction between referring "this act" and "this act, or any part thereof." They evidently decide that the legislature drafted section 9 so inartfully that it should have been obvious to everyone that a person could escape the application of section 9 by referring only sections 1 through 8. It is significant that the Attorney General, representing the Department of Revenue, did not make this argument. In fact, the first time this

interpretation of section 9 was advanced was during oral argument by a member of this court.

It is unreasonable to expect that an opponent of the temporary tax should have somehow understood and believed in this interpretation so strongly that he would have been willing to refer only sections 1 through 8. A reasonable attorney could not have advised a client that if opponents chose to refer only sections 1 through 8, they would avoid a permanent tax increase in the event that the referral was unsuccessful in defeating these sections. Under no stretch of the imagination could a reasonable attorney have advised a client that this would *assure* that section 9 would not become operative. Without such assurance, of course, the legislative scheme would have exactly the inhibiting effect that the majority agrees the legislature intended and that it also agrees would be unconstitutional.

To the contrary, we need only imagine what this court would have said if the argument now advanced by the majority had been presented on the part of taxpayers who had unsuccessfully referred sections 1-8 to the voters. Suppose the opponents had consulted a lawyer who conceived an ingenious scheme to circumvent the obvious legislative design of HB 3090. Suppose counsel advised the opponents to circulate petitions to refer only sections 1-8 of the act (temporary tax increase which would be the only operative sections if the law remained unreferred), on the ground that such petitions would not refer "this Act" within the meaning of section 9 of HB 3090. Suppose that thereafter the statute survived a vote of the people, and taxpayers now appeared before this court challenging the effect, because the act was never referred to the people. It is easy to imagine how the attorney general would respond if taxpayers sought to defeat the tax by the sophistry of which he is now made the innocent beneficiary. It is no more difficult to imagine how this court would respond to the very argument that it now presses upon the state. We would give the argument short shrift.

The issue, after all, is not what the term "act" means in the constitution but how the term was meant in section 9 of HB 3090. And the specific *constitutional* issue

is whether section 9 imposed an impermissible threat of adverse consequences to inhibit the constitutional right of referral. The majority acknowledges that it was the purpose of section 9 "to chill the exercise of the power of referendum," but it suggests that the legislature failed in its purpose because a loophole remained open to opponents of the measure, had they only been as ingenious as the majority in discovering it. But can the majority seriously believe that, because it now has discovered this loophole, unrecognized by counsel for the opponents, by the attorney general, or by the tax court, section 9 failed to accomplish its "chilling" purpose?

To repeat, no reasonable attorney could have advised opponents to proceed with a referral of sections 1-8 with the assurance that failure would avoid the consequence of section 9 by virtue of the interpretation now for the first time made by the majority. A reasonable attorney would consider that legislative intent would be a crucial element in the interpretation of section 9.

The clear intent of this act was that if someone challenged the temporary tax and lost, the temporary tax would have changed into a permanent tax. A reasonable attorney would have realized that the words "this act" could have been interpreted to mean "the major parts of this act."

In other words, a reasonable attorney, who by definition is not necessarily blessed with perfect twenty-twenty foresight, might logically conclude that a court could find sections 1 through 8 were the "guts" or "major parts of this act" because they provided for the temporary tax and that section 9 was merely an ancillary mechanical provision to be triggered only in the event that the temporary tax was approved. An opponent, with or without legal advice, would be required to weigh the advantages of possibly defeating the temporary tax against the disadvantages of possibly being subjected to a permanent tax. The weighing process itself is a "chilling effect" which might be the equivalent of a dip into Glacier Bay in the middle of January.

The majority opinion seems to be based upon the premise that the opponents of the temporary tax under a

self-preservation theory would seek out and find the procedure that would subject them to the least risk. But, what about the opponents who by design or accident refer the entire act? Does not the Oregon Constitution give the foolhardy a right to refer the entire act? The majority opinion has not addressed these questions. The plaintiff's lawyer, on oral argument in this court, was correct when he called section 9 "the hammer clause."

This legislative scheme worked. The legislature set out to make sure there was no referendum on this temporary tax by attaching a penalty to the exercise of the right of referendum. I would strike the act.

Linde, J. and Roberts J. join in this opinion.